[No. B157868. Second Dist., Div. Seven. Oct. 22, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBBIE JAMES RIVA, Defendant and Appellant.

## COUNSEL

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, Acting P. J.**—This appeal raises two issues of first impression. (1) Following a mistrial in a criminal case, may a new judge assigned to the case overrule the previous judge's pretrial ruling on the defendant's motion to suppress statements to the police on *Miranda* grounds? We conclude that although the practice should not be encouraged, the new judge can overrule the previous judge's order so long as certain due process requirements are met as they were in this case. (2) Does the requirement of Penal Code section 12022.53, subdivision (j) that "the existence of any fact required under [subdivision (d)] shall be alleged in the information" require the allegation of the enhancement be included in each count to which the prosecution seeks to have it imposed? Again we hold that although the better practice is to allege the enhancement with respect to every count on which the prosecution seeks to invoke it, the failure to do so is not fatal so long as the defendant has fair notice of his potential punishment, which he did in this case.

We further conclude the trial court did not err in admitting hearsay evidence under the "spontaneous declaration" exception; failure to instruct the jury on the "actual knowledge" requirement for assault was harmless

error, and 30 years to life is not cruel and unusual punishment for the crime of shooting at an occupied vehicle and causing great bodily injury.

## FACTS AND PROCEEDINGS BELOW

Viewed in accordance with the usual rules on appeal,[1] the evidence established defendant Robbie James Riva fired a gun from inside his car at the occupants of another car at an intersection in Long Beach. The bullets missed the occupants of the other car, but one of them struck and injured a pedestrian, Marlene Lindsey, as she and her grandchildren were walking home from the market. The occupants of the other car pulled over to where Ms. Lindsey was lying on the ground and the driver exclaimed "He was trying to shoot us, but we ducked."

Following his arrest and *Miranda* warnings Riva admitted shooting at the occupants of the car. Other evidence tied Riva to the shooting. His car and clothing matched an eyewitness description of the car and clothing of the shooter. A bullet casing found in Riva's car matched the caliber of the bullet which struck Ms. Lindsey.

Riva's first trial ended in a mistrial. In the second trial the jury convicted Riva of attempted voluntary manslaughter, assault with a deadly weapon, and discharging a firearm at an occupied vehicle. The jury also found that in committing these crimes Riva personally used a firearm within the meaning of Penal Code sections 12022.5, subdivision (a) and 12022.53, subdivision, (b) personally and intentionally discharged a firearm proximately causing great bodily injury within the meaning of Penal Code section 12022.53, subdivision (d), and personally inflicted great bodily injury on a victim not an accomplice to the crimes within the meaning of Penal Code section 12022.7, subdivision (a).

The trial court imposed and stayed sentences on the attempted voluntary manslaughter and assault convictions. On the conviction for shooting at an occupied vehicle the court sentenced Riva to the midterm of five years plus a consecutive indeterminate term of 25 years to life on the firearm enhancement under Penal Code section 12022.53, subdivision (d).

---

[1] See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].

## DISCUSSION

### I. *RIVA'S INTERROGATIONS WERE CONDUCTED IN CONFORMITY WITH THE REQUIREMENTS OF MIRANDA.*

#### A. *Factual Background*

Before each trial began Riva moved to exclude his statements to the Long Beach police on the ground they were obtained in violation of the requirements set out in *Miranda v. Arizona*.[2] The first trial judge assigned to the case, Judge Comparet-Cassani, conducted a hearing on the motion under Evidence Code section 402. Officer Nydell of the Long Beach police, the only witness, testified as follows.

The initial interrogation took place a short time after the shooting, when Nydell took Riva into custody on the campus of Long Beach City College where Riva attended classes. At the arrest scene Nydell advised Riva of his *Miranda* rights and Riva stated he understood them. Nydell did not specifically ask Riva whether he waived those rights and Riva did not specifically state he did.

After giving the *Miranda* warnings, Nydell told Riva he was under arrest for a shooting in which a woman had been injured. Riva asked how the woman was doing and Nydell responded she was "doing okay." In response to questions from Nydell, Riva admitted owning a red Chevrolet Blazer which was currently parked at the home of a friend. Riva made other admissions and statements, which were subsequently introduced at trial.

The questioning ended when Riva told Nydell: "I don't want to say anything else right now." Asked on cross-examination whether he ended the interrogation because Riva said he would not talk anymore, Nydell responded: "That's how it works."

Approximately an hour after the first interrogation ended Nydell approached Riva in the booking area of the Long Beach jail and asked Riva if he was willing to speak with him. Nydell did not remind Riva of the *Miranda* warnings he had previously given him, did not repeat the warnings and did not obtain a specific waiver from Riva of the right to counsel or the right to remain silent. Riva stated he would speak with Nydell, but not in the booking room. After they moved out of the booking area, Riva made additional statements to Nydell about the shooting.

Riva did not ask to speak to an attorney at any time during the first or second interrogation.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

Judge Comparet-Cassani, who presided over the first trial, found Riva impliedly waived his right to remain silent with respect to the statements he made to Nydell on the college campus. She further ruled, however, once Riva invoked his right to silence by stating "I don't want to say anything else right now" Nydell violated *Miranda* by initiating further questioning at the jail without readvising Riva of his rights and obtaining a new waiver. Therefore, she held, the statements made during the on-campus interrogation were admissible but the statements made at the jail were not.

Riva's first trial ended in a mistrial when a new alibi witness came forward and the prosecution discovered a police report existed which had not been turned over to the defense.

The case was reassigned to Judge Garner for retrial. Riva again moved to exclude all his statements to the police and argued in the alternative Judge Garner was bound by Judge Comparet-Cassani's ruling excluding the statements made at the jail.

After reviewing the transcript of Nydell's testimony at the first hearing and considering argument by counsel, Judge Garner ruled he was not bound by Judge Comparet-Cassani's decisions at the first hearing. He agreed with her finding Riva impliedly waived his right to remain silent with respect to the first interrogation but disagreed with her ruling Nydell violated Riva's right to remain silent by approaching him at the jail and asking him if he was willing to talk. Judge Garner concluded Nydell could reasonably interpret Riva's statement, "I don't want to say anything else right now," to mean, "don't talk to me anymore now, but I may be ready later." Therefore, Nydell acted reasonably in asking Riva an hour later if he was ready to talk some more. Accordingly, Judge Garner allowed the prosecution to introduce evidence of the statements Riva made in both interrogations.

## B. *Riva Waived His Right to Remain Silent As to the First Interrogation.*

■ We apply a de novo standard of review to a trial court's denial of a motion to suppress under *Miranda* insofar as the trial court's underlying decision entails a measurement of undisputed facts against the law.[3] Employing this standard of review we agree with the finding by both trial judges Riva voluntarily, knowingly and intelligently waived his right to remain silent with respect to the first interrogation which took place on the college campus.

■ Although Nydell did not obtain an express waiver of Riva's *Miranda* rights, decisions of the United States Supreme Court have held an express

---

[3] *People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46].

waiver is not required where the defendant's conduct makes clear a waiver is intended.[4] The question is not whether the proper form was used but whether the defendant voluntarily, knowingly and intelligently waived his Fifth and Sixth Amendment rights as delineated in *Miranda*.[5] This question is answered by reviewing "the totality of the circumstances" surrounding the interrogation.[6] If this review shows the defendant chose to speak with police after he was informed of his rights, understood the information he was given and was not tricked or coerced into surrendering those rights, a valid waiver will be implied.[7]

In the case before us, it is undisputed Nydell adequately advised Riva of his rights. Riva stated he understood these rights and there is no factual basis for concluding otherwise. On the contrary, the evidence showed Riva was 18 years of age at the time of his arrest. He had a job, a drivers license and attended college. He had previously been arrested as a juvenile. The interrogation took place in the early evening, at approximately 6:00 p.m. There is no indication Riva was tired, under the influence of drugs or alcohol, or distracted when told his rights.

On the issue of voluntariness, we find no suggestion in the record Riva was subjected to physical or psychological pressure to give up his constitutional rights. The defense does not contend otherwise.

In light of the facts and law described above, we conclude both trial judges correctly ruled Riva validly waived his Fifth Amendment right to remain silent as to the first interrogation.

C. *Nydell Did Not Violate Miranda When He Reinitiated Interrogation At the Jail.*

1. *Judge Garner had authority to revisit and overrule Judge Comparet-Cassani's Miranda rulings.*

Riva maintains Judge Garner lacked the power to review and overrule Judge Comparet-Cassani's order excluding the statements he made in jail. We have found no case directly on point.

---

[4] See, for example, *Moran v. Burbine* (1986) 475 U.S. 412, 421–423 [89 L.Ed.2d 410, 106 S.Ct. 1135]; *Fare v. Michael C.* (1979) 442 U.S. 707, 724–725 [61 L.Ed.2d 197, 99 S.Ct. 2560]; *North Carolina v. Butler* (1979) 441 U.S. 369, 373–375 [60 L.Ed.2d 286, 99 S.Ct. 1755].

[5] *North Carolina v. Butler, supra*, 441 U.S. at page 373.

[6] *Fare v. Michael C., supra*, 442 U.S. at page 725.

[7] *Moran v. Burbine, supra*, 475 U.S. at pages 422–423.

The Supreme Court left the issue open in *People v. Clark*.[8] There, Judge Ringer, the judge assigned to hear pretrial motions, denied the defendant's motion to suppress his statements to police on *Miranda* grounds. Defendant renewed his motion at trial but the trial judge refused to consider it.[9] On appeal our Supreme Court declined to decide "whether the trial court had the *authority* to allow defendant a second hearing and to disagree with Judge Ringer's decision . . . ."[10] The high court held even if the trial court had the authority to reconsider the previous ruling "it was certainly not *required* to do so."[11] Entitling the defendant to two separate evidentiary hearings before two superior court judges on the issue "would completely defeat the purpose behind pretrial *in limine* hearings on the admissibility of evidence."[12] That purpose, the court explained, "is to 'permit more careful consideration of evidentiary issues than would take place in the heat of battle during trial.' "[13]

In arguing Judge Garner was bound by Judge Comparet-Cassani's ruling, Riva relies solely on the Supreme Court's decision in *Schlick v. Superior Court*, which held the People remained bound by the first trial judge's ruling granting the defendant's motion to suppress illegally seized evidence under Penal Code section 1538.5.[14] In *Schlick*, the People dismissed the first proceeding, refiled identical charges in a second complaint and obtained a contrary ruling on the 1538.5 motion from the second trial judge.[15] *Schlick* has no precedential value here for several reasons. The court based its decision on particular provisions of section 1538.5, which do not apply to a common law motion to suppress based on *Miranda*.[16] A year after *Schlick* was decided the Legislature amended section 1538.5 to overrule it.[17] The prosecutor's conduct in *Schlick* amounted to blatant forum shopping, a factor not present in the case before us.

The People's brief is equally uninformative. Although the People argue Judge Garner was not bound by Judge Comparet-Cassani's ruling, they cite no authority to support this proposition.

---

[8] *People v. Clark* (1992) 3 Cal.4th 41 [10 Cal.Rptr.2d 554, 833 P.2d 561].

[9] *People v. Clark, supra*, 3 Cal.4th at pages 118–119.

[10] *People v. Clark, supra*, 3 Cal.4th at page 119.

[11] *People v Clark, supra*, 3 Cal.4th at page 119.

[12] *People v. Clark, supra*, 3 Cal.4th at page 119.

[13] *People v. Clark, supra*, 3 Cal.4th at page 119.

[14] All future statutory references are to the Penal Code unless otherwise specified.

[15] *Schlick v. Superior Court* (1992) 4 Cal.4th 310, 312 [14 Cal.Rptr.2d 406, 841 P.2d 926].

[16] *People v. Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 733–734 [125 Cal.Rptr. 798, 542 P.2d 1390].

[17] *People v. Superior Court (Jimenez)* (2002) 28 Cal.4th 798, 805 [123 Cal.Rptr.2d 31, 50 P.3d 743].

It is often said as a general rule one trial judge cannot reconsider and overrule an order of another trial judge.[18] There are important public policy reasons behind this rule. "For one superior court judge, no matter how well intended, even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court."[19] The rule also discourages forum shopping,[20] conserves judicial resources,[21] prevents one judge from interfering with a case ongoing before another judge[22] and prevents a second judge from ignoring or arbitrarily rejecting the order of the previous judge which can amount to a violation of due process.[23] If the first judge's ruling is not reviewable on appeal or is so egregiously wrong and prejudicial the injured party cannot wait for an appeal, there is always the remedy of an extraordinary writ in this court.[24]

To be sure, there are countervailing policy considerations. As Justice Frankfurter once remarked, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."[25] Furthermore, if the second judge erred procedurally in overruling the first judge, even though the first judge was wrong on the law and the "erring" judge was correct, it is challenging to try to explain how "the [procedural] error complained of has resulted in a miscarriage of justice."[26]

Naturally, as with all general rules, there are exceptions to the rule one judge may not overrule the order of another.[27] Of significance here, our Supreme Court has held reversal of a judgment on appeal and remand for a new trial "permits [the] renewal and reconsideration of pretrial motions and

---

[18] See for example, *People v. Woodard* (1982) 131 Cal.App.3d 107, 111 [182 Cal.Rptr. 254].

[19] *In re Alberto* (2002) 102 Cal.App.4th 421, 427 [125 Cal.Rptr.2d 526].

[20] *People v. Superior Court (Scofield)* (1967) 249 Cal.App.2d 727, 734 [57 Cal.Rptr. 818].

[21] *People v. Clark, supra,* 3 Cal.4th at page 119.

[22] *Williams v. Superior Court* (1939) 14 Cal.2d 656, 662 [96 P.2d 334].

[23] *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, 1098.

[24] *People v. Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 668 [145 Cal.Rptr. 795] (petition for writ of mandate challenging trial court's *Miranda* ruling).

[25] *Henslee v. Union Planters Bank* (1949) 335 U.S. 595, 600 [93 L.Ed. 259, 69 S.Ct. 290], (dis. opn. of Frankfurter, J.)

[26] California Constitution, Article 6, section 13. And see *People v. Castello* (1998) 65 Cal.App.4th 1242, 1249 [77 Cal.Rptr.2d 314] ("Miscarriage of justice results where a court is unable to correct its own perceived legal errors, particularly in criminal cases where life, liberty, and public protection are at stake.") Circumstances could exist of course in which a party so changed its position in reliance on the first judge's order that to allow the second judge to reverse it would deny the reliant party a fair trial. No such claim is made in the case before us.

[27] For example, in *Muro v. Superior Court* (1986) 184 Cal.App.3d 1089, 1092 [229 Cal.Rptr. 383, footnote 1], we held "another judge of the same court exercising jurisdiction over the cause may reverse or modify the prior ruling [on the pleadings]."

objections to the admission of evidence."[28] The court did not limit the power of reconsideration to the same judge who made the orders in the first trial. It is difficult to see why a new trial after a mistrial should be treated differently in this respect from a new trial after a reversal on appeal. We recognize a new trial after the unqualified reversal of a judgment on appeal is conceptually distinguishable from a mistrial. In the former the issues have been litigated to finality. In the latter, no issues have been decided definitively. The former is a "do over." The latter is a "never done." But this distinction, we believe, strengthens the justification for reconsideration after a mistrial. In the case of a mistrial the issues remain in flux, the rulings remain interlocutory and the outcome remains undetermined.

■ Our Supreme Court has treated motions to suppress under *Miranda* as *in limine* motions which, if granted, are subject to review if the People again offer the evidence at the trial.[29] We conclude, therefore, pretrial rulings on the admissibility of evidence, like rulings on pleadings, should be reviewable by another judge following a mistrial because they are intermediate, interlocutory rulings subject to revision even after the commencement of trial. It follows Judge Garner had authority to reconsider and modify Judge Comparet-Cassani's earlier ruling on Riva's *Miranda* motion.

■ This authority, however, is not unlimited. It must be exercised in conformity with the defendant's right to due process of law or, as one court put it, "with due consideration,"[30] which means the defendant must be given notice and an opportunity to be heard, and the revised ruling cannot be arbitrary or made without reason.[31] These requirements were met in the present case.

■ Furthermore, for reasons of comity and public policy discussed above, trial judges should decline to reverse or modify other trial judges' rulings unless there is a highly persuasive reason for doing so—mere disagreement with the result of the order is not a persuasive reason for reversing it. Factors to consider include whether the first judge specifically agreed to reconsider her ruling at a later date, whether the party seeking

---

[28] *People v. Mattson* (1990) 50 Cal.3d 826, 849 [268 Cal.Rptr. 802, 789 P.2d 983] (People allowed to relitigate admissibility of confession under *Miranda* at second trial following reversal of judgment on appeal).

[29] *People v. Mattson, supra,* 50 Cal.3d at page 850; *People v. Superior Court (Zolnay), supra,* 15 Cal.3d at page 734.

[30] *People v. Castello, supra,* 65 Cal.App.4th at page 1250.

[31] *People v. Castello, supra,* 65 Cal.App.4th at page 1250, citing *Morite of California v. Superior Court* (1993) 19 Cal.App.4th 485, 492 [23 Cal.Rptr.2d 666]; and see *Bradley v. Duncan, supra,* 315 F.3d at page 1098, noting "the second trial judge simply ignored the findings of the previous judge, without even bothering to assert that the earlier decision was erroneous or that the circumstances of the case had changed."

reconsideration of the order has sought relief by way of appeal or writ petition,[32] whether there has been a change in circumstances since the previous order was made[33] and whether the previous order is reasonably supportable under applicable statutory or case law regardless of whether the second judge agrees with the first judge's analysis of that law. ■ In the present case, after Judge Comparet-Cassani issued her ruling on the *Miranda* motion, the prosecutor asked for an opportunity to argue the motion further after doing more research. The judge replied: "That's fine. I'm more than happy to reverse a ruling if shown it's wrong."[34] As we discuss below, we have found no California case which supports Judge Comparet-Cassani's suppression of the statements Riva made in jail and several cases denying suppression under similar facts. Thus, Judge Garner had a sufficiently persuasive reason for reversing Judge Comparet-Cassani's order with respect to the statements made in jail just as the latter might have been persuaded to reverse her own earlier ruling had the first trial lasted long enough for the prosecutor to accept her invitation to show her she was wrong.[35]

> 2. *Under the circumstances here, the police were not required to readvise Riva of his Miranda rights before initiating further questioning.*

■ When a suspect initially responds to police questioning and then invokes the right to remain silent, that decision must be "scrupulously honored."[36] This does not mean, however, the police can never renew their questioning of the suspect.[37]

■ Ideally, the *Miranda* warnings should be repeated before reinitiating the interrogation of a suspect who has invoked the right to remain silent, but the failure to do so is not fatal if the "totality of the circumstances" shows the suspect's waiver remains voluntary, knowing and intelligent.[38] Our Supreme Court has identified factors the trial court should consider in determining whether readvisement is necessary. These include "the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any

---

[32] See *People v. Superior Court (Tunch), supra,* 80 Cal.App.3d at page 668.

[33] See *In re Kowalski* (1971) 21 Cal.App.3d 67, 70 [98 Cal.Rptr. 444] (analogizing to Code Civ. Proc., § 1008).

[34] There is no indication in the record the prosecutor ever made further argument on the matter.

[35] See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]

[36] *Michigan v. Mosley* (1975) 423 U.S. 96, 104 [46 L.Ed.2d 313, 96 S.Ct. 321].

[37] *People v. Mickle* (1991) 54 Cal.3d 140, 169–170 [284 Cal.Rptr. 511, 814 P.2d 290].

[38] *People v. Mickle, supra,* 54 Cal.3d at page 170.

indicia that he subjectively understands and waives his rights.[39] Any misconduct by the police in reinstituting the interrogation of course must also be taken into consideration.[40]

In the present case, questioning ceased once Riva told Nydell "I don't want to say anything else right now." Questioning did not resume until an hour later when Nydell asked Riva if he was ready to talk again. Nydell acted reasonably in asking Riva this question because Riva's statement he did not want to talk anymore "right now" clearly indicated he might be willing to talk in the future. A one-hour period between the end of the first interrogation and the start of the second was not so short as to constitute badgering or harassing the suspect[41] nor so long the suspect may have forgotten the *Miranda* advisement.[42] Both interrogations were conducted by the same officer. Although the second interrogation was conducted at the jail, which arguably is a more intimidating environment than a college campus, Nydell acceded to Riva's request they go somewhere more private than the booking room for their talk. The evidence does not suggest Nydell attempted to intimidate Riva at any time. As previously mentioned, Riva was a college student and therefore presumably at least as sophisticated as the ordinary citizen. In addition he had previous experience with law enforcement having been arrested as a juvenile.

Based on these facts we give Nydell's second interrogation a passing grade even though he failed to re-*Mirandize* Riva and failed for a second time to obtain a specific waiver of his rights. Under the totality of the circumstances, we agree with Judge Garner's ruling Riva's statements to Nydell at the second interrogation were voluntary and were made after a knowing and intelligent waiver of the right to an attorney and to remain silent.

II. *THE COURT PROPERLY ADMITTED A WITNESS'S HEARSAY STATEMENT DEFENDANT "WAS TRYING TO SHOOT US . . . ."*

Within a minute after Ms. Lindsey was shot an SUV containing three men arrived at the scene and the driver asked Ms. Lindsey if she had been shot. Her companion, Ms. Warren answered yes. The driver then stated, "He was

---

[39] *People v. Mickle, supra,* 54 Cal.3d at page 170.

[40] *People v. Peracchi* (2001) 86 Cal.App.4th 353, 361–362 [102 Cal.Rptr.2d 921].

[41] See *People v. Waidla, supra,* 22 Cal.4th at page 727.

[42] Compare *Michigan v. Mosley, supra,* 423 U.S. at page 104 (two hours was reasonable time between interrogations); *People v. Mickle, supra,* 54 Cal.3d at page 171 (36 hours held reasonable); *People v. Bolden* (1996) 44 Cal.App.4th 707, 713 [52 Cal.Rptr.2d 485] (30 minutes held reasonable); *People v. Thompson* (1992) 7 Cal.App.4th 1966, 1972–1973 [10 Cal.Rptr.2d 15] (nine hours between interrogations "does not, as a matter of law, vitiate the advisement");

trying to shoot us, but we ducked." The SUV then left the scene. Its occupants were never located.

Riva objected to the introduction of the driver's statement "He was trying to shoot us" on the ground of hearsay and lack of foundation. The trial court admitted the statement under the hearsay exception for spontaneous declarations.[43] We affirm this ruling.

When reviewing a ruling on the spontaneous declaration exception we bear in mind "each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter."[44]

The requirements for excitement and spontaneity were met. Ms. Lindsey testified the driver acted "real excited" and spoke quickly and in a high-pitched tone which she demonstrated for the court. Ms. Lindsey also testified the car arrived approximately a minute after the shooting. This is well within the time frame for a "spontaneous" declaration.[45]

Riva argues the driver's statement should have been excluded as lacking trustworthiness and reliability. The statement was untrustworthy, he maintains, because the driver had sufficient time to reflect on, contrive or misrepresent the event he claimed had occurred.[46] The statement is unreliable because it is an expression of the declarant's belief or opinion the defendant was shooting at him and his companions. Spontaneous declarations, Riva points out, are limited to descriptions of acts, conditions or events; they do not include the declarant's belief or opinion about the act, condition or event.[47] Furthermore, the hearsay declaration lacks foundation. The declarant stated he "ducked" and therefore could not have perceived whether the bullets Riva allegedly fired were aimed at him and his companions.

We reject Riva's argument the driver's statement was untrustworthy because in the minute between the shooting and his statement he had time to reflect on what had happened and even contrive or misrepresent the event. The requirement is for a spontaneous declaration, not an instantaneous one. As noted above, declarations uttered much longer than a minute after the

---

[43] Evidence Code section 1240.

[44] *People v. Farmer* (1989) 47 Cal.3d 888, 904 [254 Cal.Rptr. 508, 765 P.2d 940].

[45] See for example *People v. Hughey* (1987) 194 Cal.App.3d 1383, 1388 [240 Cal.Rptr. 269] (five minutes); *People v. Poggi* (1988) 45 Cal.3d 306, 319 [246 Cal.Rptr. 886, 753 P.2d 1082] (30 minutes).

[46] Spontaneous declarations are allowed into evidence on the theory the declarant has not had the time to reflect, contrive or misrepresent. (*People v. Hughey, supra,* 194 Cal.App.3d at p.1392.)

[47] Evidence Code section 1240, subdivision (a).

event have been admitted under Evidence Code section 1240. The test is not how long a period has elapsed since the event occurred, but whether it is reasonable to suppose the excitement of the event still dominates the declarant's reflective powers so the statement is likely to be " ' "the unreflecting and sincere expression of one's actual impressions and belief." ' "[48] We have no doubt being shot at is an "occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting."[49]

Nor are we persuaded by Riva's argument the driver's statement is unreliable because it is not a statement about "an act, condition or event perceived by the declarant,"[50] such as "the defendant shot the gun," but rather a statement about the declarant's belief or opinion regarding an act or event he did not perceive because he "ducked." ▉ Our Supreme Court has stated in numerous cases spontaneous declarations may include the declarant's "actual impressions and belief."[51] Furthermore, a statement about the direction in which the gun was pointed is more like part of the description of the act—"the shooter's car was facing north"—than an opinion about the event—"the shooter must have been trying to kill us." The fact the declarant ducked before the gun was fired does not mean he could not have perceived the shooter's target. If the declarant saw the gun aimed at him, ducked, and heard a bullet whiz over his head he had sufficient information to state the shooter was shooting at him. In our view, Riva's arguments on the trustworthiness and reliability of the driver's statement go to the weight to be given his testimony, not its admissibility. Riva's counsel properly attacked this evidence in her closing argument.

For the reasons stated above, the trial court did not err in admitting evidence of the driver's statement.

## III. THE TRIAL COURT'S INSTRUCTION ON ASSAULT WAS ERRONEOUS BUT THE ERROR WAS HARMLESS.

The trial court instructed the jury on assault using the 1998 version of CALJIC No. 9.00, which stated:

"In order to prove an assault, each of the following elements must be proved:

---

[48] *People v. Poggi, supra,* 45 Cal.3d at page 318.

[49] *People v. Poggi, supra,* 45 Cal.3d at page 318.

[50] Evidence Code section 1240, subdivision (a).

[51] For examples see *People v Farmer, supra,* 47 Cal.3d at page 903; *People v. Poggi, supra,* 45 Cal.3d at page 318; *Showalter v. Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895].

"1. A person willfully and unlawfully committed an act *which by its nature* would probably and directly result in the application of physical force on another person; and

"2. At the time the act was committed, the person intended to use physical force upon another person *or to do an act that was substantially certain to result in the application of physical force* upon another person; and

"3. At the time the act was committed, the person had the present ability to apply physical force to the person of another.

" 'Willfully' means that the person committing the act did so intentionally." (Italics added.)

A prior version of this instruction, which did not contain the second paragraph, was disapproved by our Supreme Court in *People v. Williams.*[52] The court held that "assault requires actual knowledge" the act, by its nature, "would probably and directly result in physical force being applied to another."[53] The instruction given in *Williams* was defective because it would "permit a conviction premised on facts the defendant *should have known but did not actually know.*"[54] In other words, under the instruction a jury could "convict a defendant for assault even if he did not actually know the facts sufficient to establish that his act by its nature would probably and directly result in a battery."[55]

The 1998 version of CALJIC No. 9.00, which was not before the court in *Williams*, suffers from the same defect as its predecessor. The addition of the second paragraph did not cure the flaw identified in *Williams*, because it still did not inform the jury the prosecution was required to prove the defendant had actual knowledge his act, by its nature, would probably and directly result in physical force being applied on another person.[56] It is not enough, under *Williams*, that the defendant should have known the probable result of his act. "[A] defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known."[57]

---

[52] *People v. Williams* (2001) 26 Cal.4th 779 [111 Cal.Rptr.2d 114, 29 P.3d 197].

[53] *People v. Williams, supra,* 26 Cal.4th at page 784.

[54] *People v. Williams, supra,* 26 Cal.4th at page 790.

[55] *People v. Williams, supra,* 26 Cal.4th at page 790.

[56] *People v. Raviart* (2001) 93 Cal.App.4th 258, 268 [112 Cal.Rptr.2d 850].

[57] *People v. Williams, supra,* 26 Cal.4th at page 788. The second paragraph of CALJIC No. 9.00 now reads: "The person committing the act *was aware of facts that would lead a reasonable person to realize* that as a direct, natural and probable result of this act that physical force would be applied." (Italics added.)

In the case at bench, however, this instructional error was harmless beyond a reasonable doubt.[58]

The *Williams* court noted the kind of instructional error which occurred there (and in the present case) "is largely technical and is unlikely to affect the outcome of most assault cases, because a defendant's knowledge of the relevant factual circumstances is rarely in dispute."[59]

There is no disagreement as to the relevant facts here. The shooting took place on a February evening at approximately 5:00 p.m., when people are normally returning from work, school or shopping. Although it would have been dark at that time of day, the shooting took place in an urban neighborhood consisting of residences such as Gold Star Manor, where Ms. Lindsey lived, and small businesses such as Tessie's Beauty Salon and the Villa Market. Ms. Lindsey, her friend Ms. Warren, and Ms. Lindsey's two grandchildren had just left the market and were approaching the gate to Gold Star Manor when Riva shot Ms. Lindsey. There were other pedestrians, including her grandchildren, and "a lot of cars" in the area when the shooting occurred.

The facts in this case would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike a pedestrian and a battery would directly, naturally and probably result from his conduct.[60] We are convinced therefore, beyond a reasonable doubt, the jury would have reached the same verdict if it had been instructed on the "actual knowledge" element of assault.

Riva argues evidence he expressed concern for the victim[61] might have convinced at least one juror he did not realize he had put her in danger. We find this argument unpersuasive because, as we explain below, even under the "actual knowledge" test when the defendant shoots into a crowd the People do not have to prove he was aiming at a particular target.

Riva contends the information charged him with assault on "Marlene Lindsey" and therefore, under *Williams*, he could not be convicted of assault absent an instruction on transferred intent or proof beyond a reasonable doubt Ms. Lindsey was the target of his shooting. This contention is without merit.

---

[58] The *Chapman* error standard applies here. *People v Williams, supra*, 26 Cal.4th at page 790.

[59] *People v. Williams, supra*, 26 Cal.4th at page 790.

[60] *People v. Williams, supra*, 26 Cal.4th at page 788.

[61] See discussion at page 987, *ante*.

Assault with a deadly weapon is a general intent crime,[62] therefore there is no intent to transfer.[63] The defendant need not intend to strike any particular person to be guilty of such an assault.[64] Rather, when the defendant shoots into a group of persons primarily targeting only one of them, the defendant can be convicted of assault with a deadly weapon as to the nontargeted members of the group.[65]

*Williams* does not hold to the contrary. The three alleged victims, a father and his two sons, were hiding behind a pickup truck when the defendant fired a shot into the wheel well of the truck. The defendant testified he saw the father crouched behind the truck but never saw the sons and did not know they were there. The jury convicted defendant of assault on the father but deadlocked on the counts involving the sons.[66] After disapproving the assault instruction given in the case for failure to require proof of the defendant's knowledge of the facts,[67] the court turned to the question whether the error was prejudicial. The court concluded that since the jury convicted defendant of assault on the father whom defendant knew was crouched behind the truck and not on the two sons whom he did not know were present behind the truck the jury was not misled by the instruction's failure to require the jury find the defendant had actual knowledge of facts sufficient to establish the act of shooting would probably and directly result in the application of physical force against another.[68]

The court's analysis of prejudice implies the instructional error would have been prejudicial had the defendant been convicted of assault on the two sons who he did not know were present. But if the error had been found prejudicial in this circumstance it would have been because the defendant was not aware of facts sufficient to establish he knew shooting at the truck could result in physical force against the sons, not because of the absence of an instruction on transferred intent or lack of proof beyond a reasonable doubt the sons were the targets of his shooting. In the present case we have

---

[62] *People v. Williams, supra,* 26 Cal.4th at page 788.

[63] *People v. Lee* (1994) 28 Cal.App.4th 1724, 1737 [34 Cal.Rptr.2d 723]. The 2003 revisions to CALJIC eliminated the transferred intent instruction as to assault.

[64] *People v. Lee, supra,* 28 Cal.App.4th at page 1737. (Assault conviction upheld where information alleged assault on named individual but evidence showed defendant shot into a group of persons.)

[65] *People v. Bland* (2002) 28 Cal.4th 313, 329 [121 Cal.Rptr.2d 546, 48 P.3d 1107].

[66] *People v. Williams, supra,* 26 Cal.4th at pages 782–783.

[67] See discussion at page 997, *ante.*

[68] *People v. Williams, supra,* 26 Cal.4th at page 790.

concluded beyond a reasonable doubt the jury would have convicted Riva of assault even if the instruction had included the "awareness of facts" ingredient.[69]

IV. *FAILURE TO PLEAD AN ENHANCEMENT UNDER SECTION 12022.53 AS TO THE COUNT ON WHICH THE ENHANCEMENT WAS IMPOSED DID NOT VIOLATE RIVA'S STATUTORY AND CONSTITUTIONAL RIGHT TO ADEQUATE NOTICE OF THE FACTUAL AND STATUTORY BASES OF THE SENTENCE ENHANCEMENTS THE PROSECUTION SOUGHT.*

The information alleged an enhancement under section 12022.53, subdivision (d)[70] as to the counts charging Riva with attempted voluntary manslaughter and assault but not as to the count charging a violation of section 246, shooting at an occupied vehicle. The verdict forms, however, asked the jury to determine whether the allegations under section 12022.53, subdivision (d) were true or not true as to all three counts. Riva did not object to the verdict form pertaining to the section 246 offense and the jury found the allegations true as to all three counts.

The trial court calculated and imposed sentence on Riva as follows.

On the conviction for attempted voluntary manslaughter the court sentenced Riva to the midterm of three years[71] plus a consecutive term of two years for the gun enhancement under section 12022.5, subdivision (a). The court did not impose sentence on the enhancement under section 12022.53, subdivision (d) even though the enhancement was alleged in the information and the jury found the allegation true. The court stayed this sentence under section 654.

As to the conviction for assault with a firearm, the court sentenced Riva to the midterm of three years[72] plus a consecutive them of four years for the gun enhancement under section 12022.5, subdivision (a). Again, the court did not impose sentence on the enhancement under section 12022.53, subdivision (d). This sentence too was stayed under section 654.

---

[69] See discussion at page 997, *ante.*

[70] Section 12022.53, subdivision (d) provides in relevant part: "Notwithstanding any other provision of law, any person who is convicted of a felony specified in . . . Section 246 . . . and who in the commission of that felony intentionally and personally discharges a firearm and proximately causes great bodily injury . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

[71] Sections 193 and 664.

[72] Section 245, subdivision (a)(1).

Finally, on the conviction for shooting at an occupied motor vehicle, the court imposed a midterm sentence of five years[73] plus a consecutive sentence under section 12022.53, subdivision (d) of 25 years to life even though the information did not allege this enhancement as to this count.

As a result of these sentencing decisions Riva is presently serving a term of 30 years to life.

Riva contends the trial court erred in adding the 25 years to life enhancement to his sentence for shooting at an occupied vehicle because the prosecution never pled this enhancement in the count charging him with that crime. Although the enhancement under section 12022.53, subdivision (d) was pled as to two counts, attempted voluntary manslaughter and assault with a firearm, and proved as to all three counts, Riva argues this was insufficient. Because the enhancement was not specifically pled as to the count charging Riva with shooting at an occupied vehicle he reasons the enhancement cannot be imposed even though the jury found the existence of the facts required by subdivision (d).[74]

Neither party has cited, nor have we found, any authority directly on point.

Riva relies principally on section 12022.53, subdivision (j) and our Supreme Court's decision in *People v. Mancebo*.[75] Both are distinguishable, however.

Section 12022.53, subdivision (j) states: "For the penalties in this section to apply, the existence of any fact required under subdivision . . . (d) *shall be alleged in the information* or indictment and either admitted by the defendant in open court or found to be true by the trier of fact." (Italics added.) Thus, subdivision (j) only requires the facts necessary to sustain the enhancement be alleged in the information; it does not say where in the information those facts must be alleged or that they must be alleged in connection with a particular count in order to apply to that count.[76] In the present case the prosecution complied with the literal language of the statute by alleging the enhancement in the information as to the charges of attempted voluntary manslaughter and assault.

---

[73] Section 246.

[74] The People contend an enhancement was adequately pled under section 12022.53, subdivision (d) because the count alleging the violation of section 246 alleged Riva "did willfully, unlawfully and maliciously discharge a firearm at an occupied motor vehicle." This contention fails, however, because section 12022.53, subdivision (d) requires proof of great bodily injury, a fact not pled in the information with respect to section 246.

[75] *People v. Mancebo* (2002) 27 Cal.4th 735 [117 Cal.Rptr.2d 550, 41 P.3d 556].

[76] See also section 1170.1, subdivision (e), which requires "[a]ll enhancements shall be alleged in the accusatory pleading[.]"

In *People v. Mancebo* the court held an enhancement had to be stricken because it was never pled, even though the elements necessary to establish it were implicit in the information and found by the jury.[77] *Mancebo* is distinguishable because the enhancement the trial court imposed was never pled as to any count by name, number or description of the qualifying circumstances.[78] In the case before us, the enhancement under section 12022.53, subdivision (d) was pled by number and description as to some of the counts in the information, just not the one on which the trial court imposed it.

The problem in *Mancebo*, the court explained, was not in the lack of proof but in the lack of notice. The trial court could not wait until the time of sentencing to decide what enhancements were necessarily established by the jury's verdicts. "[A] defendant has a cognizable due process right to fair notice of the specific enhancement allegations that will be invoked to increase punishment for his crimes."[79] Fair notice, the court explained may be critical to the defendant's ability to contest the factual bases for the enhancement.[80] Furthermore, a defendant's decision whether to plea bargain or go to trial will often turn on the extent of exposure to a lengthy prison term. The defendant would have less incentive to plea bargain if he did not know up front what enhancements the prosecution intended to seek.[81] Finally, section 1170.1, subdivision (e) requires all enhancements must be "admitted by the defendant in open court or found to be true by the trier of fact." The court pointed out that unless the prosecution makes known in advance what enhancements it intends to invoke "there would be nothing for the defendant to 'admit' in open court."[82]

Although the issue is a close one, we have concluded imposing the section 12022.53 enhancement in this case did not violate section 12022.53, subdivision (j) or Riva's right to due process of law.

As previously noted, the prosecution complied with the literal requirements of sections 12022.53, subdivision (j) and 1170.1, subdivision (e) by pleading the enhancement in other counts in the information. Had the Legislature intended an enhancement under section 12022.53 be specifically pled as to each count the prosecution sought to enhance, it knew how to say so clearly. Former sections 969c and 969d, applicable to enhancements under

---

[77] *People v. Mancebo, supra,* 27 Cal.4th at pages 752–753.

[78] *People v. Mancebo, supra,* 27 Cal.4th at pages 753–754.

[79] *People v. Mancebo, supra,* 27 Cal.4th at page 747.

[80] *People v. Mancebo, supra,* 27 Cal.4th at page 752.

[81] *People v. Mancebo, supra,* 27 Cal.4th at page 752.

[82] *People v. Mancebo, supra,* 27 Cal.4th at page 752.

sections 12022 and 12022.5 respectively, contained such a provision.[83] These sections required the facts alleged to give rise to those enhancements "shall be added to and be a part of the count or each of the counts of the accusatory pleading . . . ." The Legislature's failure to enact a similar requirement with respect to section 12022.53 and its repeal of sections 969c and 969d strongly suggest the Legislature did not intend to require such strict pleading requirements with respect to section 12022.53.[84]

More importantly, we conclude the Supreme Court's concern over lack of fair notice expressed in *Mancebo* is not applicable in the present case.

Failure to plead the section 12022.53 enhancement as to the count alleging Riva shot at an occupied vehicle did not interfere with Riva's ability to contest the factual bases of the enhancement. Riva was on notice he had to defend against the allegation under section 12022.53, subdivision (d), a principal personally and intentionally discharged a firearm which proximately caused great bodily injury, because this allegation was pled as to the attempted voluntary manslaughter and assault counts and those counts went to trial.[85] For the same reason, we are doubtful the failure to allege a section 12022.53 enhancement as to the count charging Riva with shooting at an occupied vehicle affected his decision whether to plea bargain since the other counts which did allege this enhancement obviously posed a risk of greater punishment. Finally, we find it highly unlikely a defendant would admit in open court to an enhancement which would result in a 25-year- to life sentence. However, had Riva desired to make such an admission he could have done so because the 12022.53 enhancement was alleged as to other counts.

For the reasons stated above the enhancement under section 12022.53, subdivision (d) stands.

## V. A SENTENCE OF 30 YEARS TO LIFE IS NOT CRUEL AND UNUSUAL PUNISHMENT FOR THE CRIME OF SHOOTING AT AN OCCUPIED VEHICLE AND CAUSING GREAT BODILY INJURY.

If 50 years to life for stealing $153 worth of videotapes is not cruel and unusual punishment,[86] neither is any sentence which could legally be imposed here.

---

[83] These sections were repealed by Stats. 2002, chapter 787, sections 18 and 19.

[84] Compare *People v. Tilbury* (1991) 54 Cal.3d 56, 61 [284 Cal.Rptr. 288, 813 P.2d 1318].

[85] Admittedly a different result might apply if those counts had been dismissed before trial. We need not address that question here.

[86] *Lockyer v. Andrade* (2003) 538 U.S. 63 [123 S.Ct. 1166, 155 L.Ed.2d 144].

## DISPOSITION

The judgment is affirmed.

Woods, J., and Muñoz, J., concurred.

*Appellant's* petition for review by the Supreme Court was denied February 4, 2004. George, C. J., did not participate therein.