Filed 11/24/20  P. v. Rauda CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B301948 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA458353) |
| v. | |
| JOSE ALFREDO RAUDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Jose Alfredo Rauda was convicted of 12 counts of attempted murder of a peace officer, 19 counts of assault with a firearm on a peace officer, four other counts of assault with a firearm, one count of shooting at an inhabited dwelling, one count of assaulting a police animal, and one count of possession of a firearm by a felon. The trial court sentenced Rauda to an aggregate determinate prison term of 118 years 8 months; a consecutive one-year jail term; and a consecutive aggregate indeterminate prison term of 209 years to life plus 225 years.

On appeal, Rauda challenges the sufficiency of the evidence supporting three of his convictions for assault with a firearm. While Rauda concedes that he shot the front door to an apartment, he argues there is no evidence showing he was aware that anyone was inside the apartment at that time. Rauda also argues the police violated his *Miranda*[1] rights because after he invoked his right to remain silent, police placed an undercover operative in Rauda's jail cell, and the operative thereafter elicited from Rauda statements suggesting he intended to shoot at certain police officers.

Rauda's first claim of error fails because he shot at a residence at a time generally when people are returning, or have already returned, home from work, school, or other activities. We reject Rauda's second appellate claim in adherence to binding authority from our Supreme Court. We thus affirm the judgment.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

**FACTUAL AND PROCEDURAL BACKGROUND**

We summarize only those facts that are relevant to this appeal.

On June 19, 2019, the People filed an information charging Rauda with 15 counts of attempted murder of a peace officer, in violation of Penal Code[2] sections 664 and 187, subdivision (a) (counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, 15, 16, 17, 18, and 19); 19 counts of assault with a firearm on a peace officer, in violation of section 245, subdivision (d)(1) (counts 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, and 38); one count of attempted murder, in violation of sections 664 and 187, subdivision (a) (count 39); four counts of assault with a firearm, in violation of section 245, subdivision (a)(2) (counts 40, 42, 43, and 44); one count of shooting at an inhabited dwelling, in violation of section 246 (count 41); one count of assaulting a police animal, in violation of section 600, subdivision (a) (count 45); and one count of possession of a firearm by a felon, in violation of section 29800, subdivision (a)(1) (count 46).[3] Rauda pleaded not guilty to each charged offense.

At trial, the People introduced evidence that on June 15, 2017, Rauda fired a handgun at multiple police officers as he attempted to flee from them.[4] At approximately 5:30 p.m., Officer Matthew Clymer and another police officer detained Seania Sommerville at the front entrance to an apartment at

---

[2] Undesignated statutory citations are to the Penal Code.

[3] The information does not contain a count 10, 11, 13, or 14.

[4] The remainder of this paragraph and the following three paragraphs summarize evidence the People presented at trial.

407 East 49th Street upon discovering that she had an outstanding arrest warrant. One of the officers called into the residence and directed the occupants to come out of the building. Jonathan Reyes walked out of the residence in response to that command and, after officers learned that Reyes had search conditions as part of his probation or parole, they decided to execute a search of the apartment.

At that point, six officers were in front of the apartment. The police again called out to occupants of the residence, and Rauda "popped out" from inside the apartment and fired a handgun at Officer Clymer. Rauda then escaped through a window at the rear of the apartment and began to run away. Officer Martin Higuera, who was covering the back of the apartment, ordered Rauda to get down on the ground. Rauda turned back, fired at Higuera, and continued to flee.

At or before 6:50 p.m., Rauda approached a one-story, two-bedroom apartment located at 435 1/2 East 49th Street.[5] At that time, Sanchez; his mother, Teresa Alvarez; and Sanchez's brother's girlfriend, Sandy Rivas, were in the residence. After Alvarez told Sanchez that she heard gunshots and saw someone

---

[5] In his opening appellate brief, Rauda asserts the trial evidence shows he approached this apartment "late in the afternoon." The Attorney General claims this event transpired "[s]hortly before 6:50 p.m." In his reply, Rauda does not dispute the Attorney General's claim regarding the timing of this event. Further, the People's witness to this event, Robert Sanchez, initially testified that it occurred at "around 3:00 p.m. [or] 4:00 p.m.," but then stated he did not "know exactly what time it was." In any event, Rauda does not dispute that he approached the home at some point after he initially encountered the police at around 5:30 p.m. but no later than 6:50 p.m.

4

outside the apartment, Sanchez looked out a window and saw Rauda lift the lid of a dumpster. Sanchez immediately moved away from the window because he wanted to avoid being shot. Next, Sanchez, Alvarez, and Rivas ran into a closet, and thereafter heard several gunshots that were fired at the front door of the apartment; this front door led to the living room of the residence. Later, Sanchez noticed the front door contained several holes that were not there before he heard the gunshots.[6]

Rauda continued to flee from the police. In the course of officers' pursuit of Rauda, a police dog sustained a gunshot wound to his left rear leg, and Rauda took refuge in a shed. When Officer Rene Gonzalez looked through one of the shed's windows, Rauda fired at Gonzalez, the bullet hit Gonzalez's helmet, and Gonzalez took cover behind a vehicle. Rauda fired more shots at the pursuing officers, and the officers likewise fired their weapons at him. The standoff concluded when Rauda ultimately exited the shed and surrendered to the police.

While Rauda was in police custody, he invoked his right to remain silent under *Miranda*. Rauda was later placed in a jail cell with an undercover operative who recorded their conversation using a hidden audio and video device. A redacted version of this recording was played for the jury at trial.[7] It is

---

[6] This incident gave rise to count 41 (discharging a firearm at an occupied dwelling), and counts 42, 43, and 44 (assault with a firearm); each of the three assault counts corresponds to the three occupants of the apartment.

[7] Although the recording of Rauda's statements to the undercover operative was admitted into evidence, the transcript of the recording was not. Only the unadmitted transcript is in

undisputed that in the recording, Rauda made certain statements suggesting he intended to shoot at the police officers who were pursuing him.

The jury convicted Rauda on all charged offenses, with the exception of count 39 (attempted murder); and counts 3, 4, and 6 (each of which alleged attempted murder of a peace officer). The jury deadlocked on these 4 counts; the trial court then dismissed them at the People's request. On October 17, 2019, the trial court imposed an aggregate determinate prison term of 118 years 8 months, along with a consecutive one-year jail term, followed by a consecutive aggregate indeterminate prison term of 209 years to life plus 225 years. As relevant here, six years of the aggregate determinate prison sentence are attributable to counts 42, 43, and 44 (convictions for assault with a firearm), and 209 years to life plus 220 years of the indeterminate prison term are attributable to counts 1, 2, 5, 7, 8, 9, 12, 16, 17, 18, and 19 (convictions for attempted murder of a peace officer).[8]

Rauda timely appealed the judgment.

## DISCUSSION

### A. Substantial Evidence Supports Rauda's Convictions on Counts 42, 43, and 44

Rauda contends we must reverse his convictions on counts 42, 43, and 44 for assault with a firearm because the People failed to present sufficient evidence that he possessed the

_____

the record before us. Because the parties rely on the transcript for the contents of this conversation, we shall do the same.

[8] The trial court stayed the sentence for count 15 (attempted murder of a peace officer).

6

mental state required for those offenses. He argues "[t]here is no evidence that [he] knew or had any previous contact with the occupants [of 435 1/2 East 49th Street], nor that he knew anyone was at home."[9] We disagree.

" 'In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656–657.) Put differently, we must "determine whether [the record] contains evidence sufficient to permit any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." (See *People v. Hernandez* (2011) 200 Cal.App.4th 1000, 1004.) In conducting this analysis, the reviewing court must "view[ ] all the evidence in the light most favorable to the prosecution, and draw[ ] all reasonable

---

[9] According to Rauda, the evidence merely shows that, "while fleeing from the police, [he] attempted to break into a house by shooting out the lock on the front door." Insofar as Rauda argues there was insufficient evidence of mens rea because he simply intended to shoot the lock off a door, we reject that contention because the specific intent to cause harm is not an essential element of the offense. (See *People v. Riva* (2003) 112 Cal.App.4th 981, 999 (*Riva*) ["Assault with a deadly weapon is a general intent crime . . . . The defendant need not intend to strike any particular person to be guilty of such an assault," fn. omitted], disapproved on another ground in *People v. Anderson* (2020) 9 Cal.5th 946, 955, 957.)

7

inferences in favor of the jury's findings." (See *People v. Perez* (2017) 18 Cal.App.5th 598, 607.)

"[W]hen a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the defendant bears the burden of convincing us otherwise. . . . [¶] . . . [A]n appellate court is 'not required to search the record to ascertain whether it contains evidence that will sustain [the appellant's] contentions.' [Citation.] . . . [¶] . . . [T]he defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict." (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573–1574 (*Sanghera*).)

Section 245, subdivision (a)(2) prohibits "[a]ny person [from] commit[ting] an assault upon the person of another with a firearm." (See § 245, subd. (a)(2).) Our high court has held that " 'a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery [(i.e., physical force being applied to another)] would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. *He, however, need not be subjectively aware of the risk that a battery might occur.*' " (*People v. Wyatt* (2010) 48 Cal.4th 776, 781.)

In *Riva*, "the evidence established defendant . . . fired a gun from inside his car at the occupants of another car at an intersection in Long Beach," and that, although "[t]he bullets missed the occupants of the other car, . . . one of them struck and

8

injured a pedestrian" who was "walking home from the market." (See *Riva, supra,* 112 Cal.App.4th at p. 986.) Although the trial court failed to instruct the jury that "the prosecution was required to prove the defendant had actual knowledge his act, by its nature, would probably and directly result in physical force being applied on another person," the Court of Appeal upheld the conviction because the "instructional error was harmless beyond a reasonable doubt." (See *id.* at pp. 996–1000.)

The *Riva* court explained that "[t]he shooting took place on a February evening at approximately 5:00 p.m., when people are normally returning from work, school or shopping . . . . in an urban neighborhood consisting of residences . . . and small businesses . . . ." (See *Riva, supra,* 112 Cal.App.4th at p. 998.) Further, "[t]here were other pedestrians, including [the victim's] grandchildren, and 'a lot of cars' in the area when the shooting occurred." (*Ibid.*) The panel concluded that "[t]he facts of this case would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike a pedestrian and a battery would directly, naturally and probably result from his conduct." (*Ibid.*)

The same is true here when, on a weekday, Rauda fired at the front door of a residence at a time when generally people are returning from, or have already returned home from, work, school, or other activities.[10] (See fn. 5 & its accompanying paragraph, *ante*.) Moreover, Rauda does not identify any evidence showing that prior to the shooting, he attempted to ascertain that the residence was unoccupied. (See *Sanghera,*

---

[10] We take judicial notice of the fact that June 15, 2017 was a Thursday. (See Evid. Code, §§ 452, subd. (h) & 459.)

9

*supra*, 139 Cal.App.4th at p. 1574 ["[T]he defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict."]; cf. *Creech v. Fraunheim* (9th Cir. 2015) 800 F.3d 1005, 1008–1010, 1012–1014 [rejecting a habeas petitioner's sufficiency-of-the evidence challenge to his assault with a firearm convictions in part because the petitioner "took 'no steps to ascertain that the house was unoccupied' " before he shot at the front door to the dwelling].)  Under these circumstances, a rational factfinder could infer Rauda knew of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from his conduct. In sum, there was substantial evidence to support the jury's verdict on counts 42, 43, and 44.

## B.  *Miranda* Does Not Apply to Rauda's Encounter with the Undercover Operative

Under *Miranda* and its progeny, " ' "the accused must be adequately and effectively apprised of his rights" to remain silent and to have the assistance of counsel [prior to a custodial interrogation].  [Citation.]  "[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial" [citation], at least during the prosecution's case-in-chief [citations].' "  (See *People v. Nelson* (2012) 53 Cal.4th 367, 374, 377, citing, inter alia, *Miranda, supra*, 384 U.S. at p. 467.)

Rauda contends that the police violated his *Miranda* rights by placing an undercover operative in his cell with the intention of eliciting incriminating statements from Rauda after he had

10

already invoked his right to remain silent.  Although Rauda "recognizes that case law does not support his position," he urges us to "re-examine the parameters of police being able to subvert the protection afforded to the accused under the Fifth Amendment to the United States Constitution and *Miranda*."[11] Rauda further argues that this *Miranda* violation prejudiced him because "the question of whether . . . [Rauda] had the intent to kill or was 'merely' trying to keep police at bay so he could escape was a close question and the evidence contained in [his] statement to the undercover operative was critical to the jury convicting on most of the attempted murder convictions."  He asks us to reverse his convictions on counts 1, 2, 5, 7, 8, 9, 12, 15, 16, 17, 18, and 19, and remand this matter for a new trial on those offenses.

*People v. Tate* (2010) 49 Cal.4th 635 is fatal to Rauda's argument.  Citing United States Supreme Court and state supreme court precedent, the *Tate* court observed that "[b]oth 'custody' and 'police questioning' are necessary to invoke *Miranda*, and both concepts are viewed from the

---

[11] In support of this argument, Rauda relies upon Justice Liu's dissent from an order denying review in *People v. Valencia*, S258038.  In his dissenting statement, Justice Liu "f[ound] dubious the claim that it is lawful for the police to continue questioning a suspect who has invoked *Miranda* rights and remains in custody so long as the police disguise the interrogation," and he called upon "the Legislature to examine whether additional safeguards are necessary to restore *Miranda*'s core purpose of ensuring that any statement made by a suspect to the police is 'truly . . . the product of his free choice.' "  (See *People v. Valencia* (Aug. 5, 2019, B283588) [nonpub. opn.], review den. Dec. 11, 2019, S258038 (dis. stmt. of Liu, J.).)

11

suspect's perspective." (See *Tate* at pp. 685–686, citing, inter alia, *Illinois v. Perkins* (1990) 496 U.S. 292, 296, & *People v. Mayfield* (1997) 14 Cal.4th 668, 758.) This is because "*Miranda*'s aim is to ensure that the suspect's will to remain silent is not overborne by the coercive atmosphere of *police questioning* in custody." (See *Tate*, at p. 686.) Consequently, "voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve one of these two critical concerns" of custody and police questioning, and *Miranda* is inapplicable in such a case "even if a suspect happens to be in custody" at the time that person makes inculpatory statements. (See *id.* at pp. 685–686.)

"[A]s an inferior state court, . . . . we are bound by the California Supreme Court's holding on [such] issue[s] of federal law," including its interpretation of United States Supreme Court precedent. (See *Tanguilig v. Bloomingdale's, Inc.* (2016) 5 Cal.App.5th 665, 673.) Thus, we cannot accept Rauda's invitation to "re-examine" whether *Miranda*'s protections are available to a suspect who made inculpatory statements to an undercover police operative while in custody. Further, because *Tate* holds that the requisite "critical *[Miranda]* concern" of " 'police questioning' " is absent under such circumstances, we reject Rauda's claim that the trial court erred in admitting the statements he made to the undercover operative.[12] (See *Tate, supra,* 49 Cal.4th at p. 686.)

_____

[12] We note that, even after the Attorney General pointed out that *Tate* undermines Rauda's *Miranda* claim, Rauda made no attempt to distinguish *Tate* or to explain why we are not bound by that precedent. (See also *People v. Stanley* (1995)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, Acting P. J.

We concur:

CHANEY, J.

FEDERMAN, J.*

---

10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]"].)

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.