170 Cal.App.4th 910 (2008)
THE PEOPLE, Plaintiff and Respondent,
v.
ELI JORDAN ANDERSON, Defendant and Appellant.
No. D050432.
Court of Appeals of California, Fourth District, Division One.
December 31, 2008.
*916 Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch, Ivy B. Fitzpatrick and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
NARES, J. 
In June 2006 the San Diego County District Attorney charged Eli Jordan Anderson with felony hit and run resulting in death, under Vehicle Code[1] section 20001, subdivisions (a) and (b)(2). In the first trial in October 2006 the jury was unable to reach a verdict, voting seven to five in favor of acquitting Anderson, and the court declared a mistrial. In December 2006 a second trial commenced and the jury found Anderson guilty.
In February 2007 the court sentenced Anderson to 365 days in county jail, stayed that sentence pending appeal, and gave him five years' probation. The court also ordered Anderson to pay the victim's family $34,092.02 in restitution.
On appeal, Anderson asserts the court committed prejudicial error by (1) excluding evidence the victim was suicidal and expert testimony on "fight or flight" syndrome, which the court had allowed him to present in the first trial; (2) refusing his proposed instructions on constructive knowledge; (3) failing to sua sponte give a unanimity instruction; (4) instructing the jury under CALCRIM No. 2140; (5) refusing to allow him to reopen his case following closing arguments; and (6) ordering restitution as a condition of probation. We affirm.

*917 FACTUAL AND PROCEDURAL BACKGROUND

A. People's Case

In July 2005 Anderson, who was 18 years old at the time, was working as a production assistant filming commercials in Los Angeles. On the Fourth of July weekend, he drove home to San Diego County.
On the evening of July 1 he socialized with some friends. He had a video camera with him and documented the evening's events. Although some of his friends were drinking, there was no evidence presented at trial that he drank or took any drugs that evening.
A little after midnight Anderson left his friends and began driving to his girlfriend's house in Lakeside. He drove east on Fletcher Parkway, near the Parkway Plaza shopping mall, in the fourth of five traffic lanes. He observed no other cars on the road or pedestrians nearby. He reached down to change the radio station on his car stereo and took his eyes off the road for between five and 10 seconds. He heard a bang, followed by his windshield shattering and glass getting in his hair, eyebrows and mouth.
Anderson testified he did not know what happened to cause his windshield to shatter. Based upon recent media accounts of rocks being thrown at cars, he thought an unknown person had thrown a rock through his windshield. Feeling fearful and confused, Anderson called his girlfriend, Jenin. He told her he was going to look at his car, and he pulled into the parking lot at one end of the mall. Anderson recorded on his video camera his inspection of the car and noted there was blood at the top of the windshield and significant damage to his car. He realized he had struck an animal or a person.
According to Anderson, he then drove slowly along the parking lot fronting Fletcher Parkway, looking onto the road to see what he might have collided with. He did not see any evidence of a collision or what he may have hit. He testified he could see through or around hedges separating the parking lot from Fletcher Parkway. However, he admitted he did not drive along the portion of the roadway where the accident occurred, there were places where he could not see through the hedges, and he did not leave his vehicle to take a closer look.
Anderson left the mall, drove onto the freeway and called Jenin to tell her he was driving to her home in Lakeside. Jenin told him it was unsafe to drive with a shattered windshield and to pull off the freeway at a restaurant called Janet's Cafe, which the two frequented.
*918 Anderson's friend, Ian Tanner, showed up at the cafe, followed by Jenin. Anderson and Jenin then drove to her house in Jenin's vehicle.
Gregory Gilbride was driving with two friends down Fletcher Parkway after midnight on the morning of July 2, 2005, when he saw a man lying across the fifth lane of traffic, who he assumed was a "drunken bum."[2] Gilbride pulled into the mall parking lot to render assistance. He testified he needed to walk through the hedges on the edge of the parking lot to see the body.
As Gilbride approached, he saw blood and "a mangled body." The man was grunting and trying to get up, but he could only lift himself a few inches before collapsing again. Gilbride diverted traffic around the victim until police arrived. During that time he did not observe any vehicles driving around the mall parking lot.
Gilbride's 911 call was placed at 12:35 a.m., and police officers arrived within a few minutes. Officers determined the critically injured man was Robert Milligan. Paramedics arrived and they transported Milligan to the hospital, where he subsequently died from his injuries. He had massive head and face injuries as well as chest damage.
Jenin testified that after she and Anderson arrived at her house, she and her brother, Andy Kunz, drove in his truck back to the scene of the accident to learn what had happened. As they approached the scene they were stopped by a police officer. Jenin asked the officer what had happened, and he responded that a pedestrian was hit by a car. Jenin asked if it was a male or female. Jenin then told the officer that she "just wanted to know because [she] was looking for [her] mom." They then drove to Janet's Cafe, where she saw the blood on Anderson's shattered windshield.
When Jenin and Kunz returned to their home they reported the news to Anderson. According to Jenin, he appeared "shocked" and stated he wanted to immediately turn himself in. However, Jenin's father suggested he wait until an attorney could be contacted. Anderson's father, Michael Anderson, was also contacted and he arrived a short time later. Anderson never contacted police.
On the evening of July 2, 2005, an anonymous male caller provided police with the first name of the driver who collided with Milligan. The next day, another anonymous caller informed police that the vehicle involved in the *919 incident was located in the parking lot where Janet's Cafe was located. When officers arrived at the scene they found Anderson's car and traced its registration to Anderson's parents. They also discovered Anderson's camcorder in the front passenger seat.
Evidence technician Julie Palos examined the vehicle. She found hair and blood samples imbedded in the windshield. Crime lab technician Michelle Hassler determined the DNA in the blood samples taken from the windshield matched Milligan's DNA.
Detective John Pearsley was the lead investigator on the case. He matched debris from the collision scene to Anderson's car. An examination of the videotape from Anderson's car revealed Anderson was the driver of the vehicle that struck Milligan. Based upon the injuries Milligan suffered to the right side of his body, a prominent scuff mark on the right side of his shoe, and his resting place in the fifth lane of traffic, Detective Pearsley opined Milligan was running from the median toward the sidewalk when he was struck. He testified that the significant damage to the inside of Milligan's left leg, which reflected the point of impact, could not have happened if Milligan were walking northbound. Detective Pearsley also stated that the scuff mark on the ball of Milligan's right shoe indicated his weight was on his right foot at the time he was struck. He also testified Milligan's resting place in the southernmost lane of traffic indicated he was headed, probably running, in a southerly direction at the time of impact because his forward momentum would continue the same direction after impact.

B. Defense Case

Anderson presented the testimony of Dr. Harry Bonnell, a forensic pathologist. Based upon his examination of the evidence, he opined one could not tell from the evidence which way Milligan was moving across the street when Anderson struck him or whether Milligan was walking, running or tripped at the time of impact.
San Diego Police Officer Stephen McDonald testified that on May 27, 2005, there was a series of incidents involving rocks thrown at cars in various locations around San Diego. In one of the incidents, a passenger in a car struck by a rock was fatally injured when the rock came through the windshield. As part of his investigation of the incidents, he notified the press and asked them to appeal to the public for help in locating the assailants.

*920 DISCUSSION

I. EVIDENTIARY RULINGS

Anderson asserts that his state and federal constitutional rights were violated when the court excluded (1) evidence that the victim committed suicide, and (2) and expert testimony on "flight or fight" syndrome. We reject this contention.

A. Background

1. First trial

At the first trial in this matter, Anderson was allowed to present, over the objection of the People, evidence that Milligan may have committed suicide. The court[3] found the evidence relevant to whether Anderson knew he had struck someone. In allowing such evidence, the court stated, "It is a question of fact for the jury to determine whether or not the defendant knew he was in an accident . . . ." The court reached that decision after taking the matter under submission, and cited 11 different cases in support of the ruling. The court found that evidence Milligan might have jumped or flung himself from the right side of Anderson's car, contrary to the People's theory Milligan was merely jaywalking and Anderson must have known he hit a person because he was traveling from the center of the street across Anderson's line of sight, was also relevant to the issue of whether he knew he had hit a person.
The court then held an Evidence Code section 402[4] hearing to determine the admissibility of the expert testimony of Dr. Thomas Streed on fight or flight syndrome. Dr. Streed testified that fight or flight syndrome is a person's response to a perceived threat, when that person acts without thinking. At the conclusion of the hearing, the court ruled that Anderson could present this evidence as relevant to Anderson's "intent, the knowledge element...."
At the trial evidence was received to support Anderson's claim that Milligan committed suicide by jumping in front of his car. A friend of Milligan's, James Ribley, testified that the day before his death, he was very depressed about something and told Ribley "he wanted to kill himself." He also testified concerning Milligan's mental health issues, which included *921 Milligan asking Ribley one time after he was released from San Diego County Mental Health Services (County Mental Health) if Ribley was his father, and on another occasion expressing the belief that Adolf Hitler was his father. In the weeks before his death, Milligan talked to Ribley on 10 to 15 occasions about dying.
Rex Wells, another friend of Milligan's, testified that two days before the incident Milligan told him he "might as well run in front of a car on the freeway." He also told Wells he was searching for his birth mother and that he had to find his German heritage. He testified that on three separate occasions within the two months prior to his death, Milligan had talked for over an hour about ending his life. When Milligan was with him two days before his death, he observed Milligan take a wooden pallet out of the back of his truck and write something on it. After Milligan's death it was discovered the writing said, "I don't have hopes and dreams . . . plans and schemes and don't have much reason to live." Mental health records indicated Milligan was taken to County Mental Health two to four weeks before his death.
The medical examiner who conducted the autopsy on Milligan concluded his death was likely the result of a suicide. Anderson's pathologist expert, Dr. Bonnell, also opined the victim had committed suicide. He also opined the note left on the pallet in the back of Milligan's truck was a suicide note.
With regard to the fight or flight syndrome expert testimony, Dr. Streed testified that it would have caused Anderson to have no control over his reaction to being struck in the windshield, and he would perceive a need to flee from the perceived danger.
The first trial resulted in a hung jury, the jury voting seven to five in favor of acquittal. The court then declared a mistrial.

2. Retrial

At the retrial defense counsel made an offer of proof that this same evidence would be presented on behalf of Anderson in support of his defense that he did not know he had struck a person and did not willfully fail to stop and render aid. However, the court[5] excluded evidence of Milligan's alleged suicidal thoughts and Dr. Streed's proposed testimony concerning fight or flight syndrome, finding the evidence was irrelevant and inadmissible under Evidence Code section 352. With regard to the evidence Milligan was suicidal, the court stated: "It is the court's position and determination that the *922 legal bedrock underlying certain of the court's evidentiary rulings in this case is and should be as follows: [¶] That it matters not whether the decedent, Mr. Robert Milligan, was, in a manner of speaking, Mother Teresa or the devil incarnate; that it matters not what Mr. Robert Milligan's mental state was at the time of or precedent to the collision. That apart from any pre-existing physical trauma, it matters not what Mr. Robert Milligan's physical condition was at the time of or precedent to the collision. [¶] What does matter is the following: [¶] First, was Mr. Robert Milligan a human being? [¶] Second, was he alive prior to being struck by a vehicle on Fletcher Parkway in El Cajon in the early morning hours of July 2nd, 2005? [¶] Third, was that collision a cause of death of Mr. Robert Milligan? [¶] Fourth, was the defendant, Mr. Eli Anderson, the driver of the vehicle that collided with Mr. Robert Milligan? [¶] Fifth, did the defendant stop at the scene of the collision, provide reasonable assistance, and/or identify himself consistent with the requirements of Vehicle Code section 20003? [¶] Sixth, did the defendant know that he had been involved in an accident that injured another person, or did the defendant know from the nature of the accident that it was probabl[e] that another person had been injured?" (Italics added.)

B. Analysis

(1) In a criminal trial, the trial court generally has broad authority to reconsider interim rulings and correct its own prejudgment errors. (In re Alberto (2002) 102 Cal.App.4th 421, 426 [125 Cal.Rptr.2d 526].) However, a different rule applies to a second judge's reconsideration of the ruling of a different judge. (Id. at p. 427.) "Different policy considerations ... are operative if the reconsideration is accomplished by a different judge. Accordingly, the general rule is just the opposite: the power of one judge to vacate an order made by another judge is limited." (Ibid.) "For one superior court judge, no matter how well intended, even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court." (Ibid.) This rule is intended to promote orderly administration of justice, prevent forum shopping, preserve confidence in the integrity of the courts, and prevent one judge from interfering with a case pending before another judge. (Ibid.; People v. Riva (2003) 112 Cal.App.4th 981, 991 [5 Cal.Rptr.3d 649] (Riva).)
If, however, a judgment is reversed on appeal and remanded for a new trial, the rulings on pretrial motions and objections to evidence may be reconsidered. (Riva, supra, 112 Cal.App.4th at pp. 991-992.) The Court of Appeal in Riva concluded this principle also applied where a mistrial was granted, and the matter subsequently transferred to a different judge. (Id. at p. 992.) "In the case of a mistrial the issues remain in flux, the rulings remain interlocutory and the outcome remains undetermined." (Ibid.) "We conclude, *923 therefore, pretrial rulings on the admissibility of evidence, like rulings on pleadings, should be reviewable by another judge following a mistrial because they are intermediate, interlocutory rulings subject to revision even after the commencement of trial." (Ibid.)
(2) Reconsideration of a prior ruling of another judge following mistrial requires that "the defendant must be given notice and an opportunity to be heard...." (Riva, supra, 112 Cal.App.4th at p. 992.) In addition, "the revised ruling cannot be arbitrary or made without reason." (Ibid.) "Furthermore, for reasons of comity and public policy discussed above, trial judges should decline to reverse or modify other trial judges' rulings unless there is a highly persuasive reason for doing somere disagreement with the result of the order is not a persuasive reason for reversing it. Factors to consider include whether the first judge specifically agreed to reconsider her ruling at a later date, whether the party seeking reconsideration of the order has sought relief by way of appeal or writ petition, whether there has been a change in circumstances since the previous order was made and whether the previous order is reasonably supportable under applicable statutory or case law regardless of whether the second judge agrees with the first judge's analysis of that law." (Id. at pp. 992-993, fns. omitted.)

1. Ample evidence supported reconsideration of first trial judge's order

Because the case was reassigned to a different judge following a mistrial, the court had the power and authority to reconsider the admissibility of the evidence concerning Milligan's alleged suicidal thoughts and the expert testimony concerning fight or flight syndrome. Moreover, Anderson was given notice of the motion to exclude the evidence and ample opportunity to argue the matter. The court considered the proposed evidence and the law applicable to the subject and therefore its ruling cannot be considered "arbitrary or made without reason." (Riva, supra, 112 Cal.App.4th at p. 992.)
The court had persuasive reasons for excluding the evidence. Whether Milligan was suicidal had little or no relevance to whether the objective evidence in the case supported Anderson's claim he did not know he had hit a person. Moreover, the court did not preclude Anderson from arguing that because of the sudden nature of the accident, he did not know what he had hit. The evidence had highly charged emotional undertones, potentially raising sympathy for Anderson and painting the victim as a less than sympathetic character. As to the proposed fight or flight testimony, the court could have reasonably concluded it was not supported by the facts because Anderson stopped, called his girlfriend, videotaped his vehicle, and drove *924 back through the mall parking lot to see what he had hit. The court made a reasonable and well-founded decision to keep the trial grounded in the facts and relevant evidence.

2. There was no abuse of discretion in excluding the evidence under Evidence Code section 352

Even if the evidence of Milligan's suicidal thoughts and the expert testimony on fight or flight syndrome had some relevance, the court did not abuse its discretion in determining that their probative value was substantially outweighed by their prejudicial effect.
(3) Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The "prejudice" referred to in Evidence Code section 352 is that which "'"uniquely tends to evoke an emotional bias against [a party] as an individual,"'" while having only slight probative value. (People v. Garceau (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664], overruled on other grounds in People v. Yeoman (2003) 31 Cal.4th 93, 117-118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)
Under this section, "the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion `must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125 [36 Cal.Rptr.2d 235, 885 P.2d 1].)
Here, the evidence of Milligan's suicidal thoughts had little probative value, but had the potential of being highly prejudicial. It had an obvious tendency to evoke an emotional bias against the victim, while at the same time evoking sympathy for Anderson. Whether Milligan intentionally stepped in front of Anderson's car, or was negligent in crossing the road, was not a relevant issue in the case. There was little or no dispute that the crash took Anderson by surprise. The relevant question was, after he was surprised, what did he do next, and what could he reasonably believe he had hit? As CALCRIM No. 2140 states, "[t]he driver of a vehicle must perform the duties listed regardless of who was injured and regardless of how or why the accident happened. It does not matter if someone else caused the accident or if the accident was unavoidable."
*925 As to the proposed expert testimony on fight or flight syndrome, a reasonable court could also have determined that its probative value was substantially outweighed by the potential it would cause undue prejudice, a confusing of the issues, or a misleading of the jury. As explained, ante, the proposed fight or flight syndrome was contrary to Anderson's own trial testimony and version of events. He admitted that he left the scene after stopping, viewing his car, and determining he had either hit a person or an animal, based upon the blood and damage to his car, and then going back to see if he could determine what he hit. This testimony is inconsistent with a theory, as espoused by Anderson, he was "consumed with the need to get to a place of safety," and his leaving the scene was an automatic response over which he had no control. The proffered evidence did, however, have the potential of arousing sympathy for Anderson, misleading the jury, confusing the issues and serving as a distraction, given Anderson's defense and version of events.
(4) In sum, the court did not abuse its discretion in excluding the proffered evidence under Evidence Code section 352 as Anderson cannot show the court "`exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (People v. Rodrigues, supra, 8 Cal.4th at pp. 1124-1125.)

II. REFUSAL OF INSTRUCTION ON CONSTRUCTIVE KNOWLEDGE

Anderson asserts the court erred when it refused to instruct the jury with a pinpoint instruction on constructive knowledge he had proposed. This contention is unavailing.

A. Background

At trial, Anderson requested that the court, in addition to giving an instruction under CALCRIM No. 2140, which sets forth the elements of the crime of felony hit and run resulting in death, give an instruction stating, "Knowledge may be imputed to the driver of a vehicle where the fact of injury is visible and obvious or where the seriousness of the collision would lead a reasonable person to assume that there must have been resulting injuries." However, the court refused the proposed instruction because it duplicated the standard instructions given to the jury, specifically CALCRIM Nos. 2140 and 3406.
Accordingly, the court instructed the jury under CALCRIM No. 2140, which states the knowledge element as, "The defendant knew that he had *926 been involved in an accident that injured another person, or knew from the nature of the accident that it was probable that another person had been injured." The court further instructed the jury on knowledge under CALCRIM No. 3406, as follows: "The defendant is not guilty of the crime charged in Count One if he did not have the intent or mental state required to commit the crime, because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit the charged crime. [¶] If you find that the defendant did not know that it was probable that he had struck a human being, and if you find that belief was reasonable, he did not have the specific intent or mental state required for the charged crime. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for the charged crime, you must find him not guilty." (Italics added.)

B. Analysis

(5) Although a defendant generally has a right to a pinpoint instruction on a particular defense theory (People v. Earp (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15]), "instructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effect of certain facts on identified theories `is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.' [Citation.]" (People v. Wharton (1991) 53 Cal.3d 522, 570 [280 Cal.Rptr. 631, 809 P.2d 290].) Further, a court may also properly refuse a pinpoint instruction that is an incorrect statement of law (People v. Gurule (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224]), that is confusing (People v. Moon (2005) 37 Cal.4th 1, 30 [32 Cal.Rptr.3d 894, 117 P.3d 591]), or that is merely duplicative of other instructions (People v. Bolden (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931]).
(6) The California Supreme Court has defined the knowledge element of felony hit and run resulting in death as follows, "[C]riminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (People v. Holford (1965) 63 Cal.2d 74, 80 [45 Cal.Rptr. 167, 403 P.2d 423], fn. omitted (Holford).) This definition has not changed since Holford, and, as stated, ante, CALCRIM No. 2140 accurately and fully describes this element. Indeed, CALCRIM No. 2140 cites Holford as authority for the knowledge element. (Bench Notes to CALCRIM No. 2140 (2008) p. 165.)
Nevertheless, Anderson asserts that his requested pinpoint instruction, taken from the case People v. Carter (1966) 243 Cal.App.2d 239 [52 Cal.Rptr. *927 207] (Carter), needed to be given to the jury as it "more accurately" reflects the knowledge element and defense theory of the case.
The Court of Appeal's decision in Carter did not purport to change or "more accurately" define the constructive knowledge standard stated in Holford. Instead, the Court of Appeal used Holford to find there was insufficient evidence of constructive knowledge in that case. (Carter, supra, 243 Cal.App.2d at p. 241.) Carter's discussion of situations that might meet the Holford definition, "visible and obvious" injury situations and the "seriousness of the collision," merely constituted illustrations of the Holford standard. (Carter, supra, at p. 241.) Accordingly, the requested pinpoint instruction was properly refused. Indeed, because there might be situations where the fact of injury may not be "visible and obvious" and the collision not "serious," but the overall facts of the collision are such that a reasonable person would find it probable that another person had been injured, the requested instruction could in fact be misleading.

III. UNANIMITY INSTRUCTION

Anderson contends the court should have instructed the jury sua sponte with a unanimity instruction as to when he knew he had been involved in an injury-causing accident and therefore, when his duty to act arose. We reject this contention.
(7) A defendant's constitutional right to a unanimous jury verdict requires that when the evidence shows more than one unlawful act that could support a single charged offense, the prosecution must either elect which act to rely upon or the trial court must sua sponte give a unanimity instruction telling the jurors they must unanimously agree which act constituted the crime. (People v. Melhado (1998) 60 Cal.App.4th 1529, 1534 [70 Cal.Rptr.2d 878].) The unanimity instruction is designed to eliminate the danger that a defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed. (Ibid.)
However, no unanimity instruction is required when the prosecution presents multiple theories regarding one discrete criminal act or event. (People v. Russo (2001) 25 Cal.4th 1124, 1134-1135 [108 Cal.Rptr.2d 436, 25 P.3d 641]; People v. Carlin (2007) 150 Cal.App.4th 322, 347 [58 Cal.Rptr.3d 495].) In Russo, the California Supreme Court explained the distinction between multiple theories (not requiring a unanimity instruction) and multiple acts (requiring a unanimity instruction): "[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or ... the `theory' whereby the defendant *928 is guilty. . . ." (Russo, supra, at p. 1132.) "The jury must agree on a `particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate `when conviction on a single count could be based on two or more discrete criminal events,' but not `where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (Id. at pp. 1134-1135.)
Likewise in this case no unanimity instruction was required as to when Anderson's duty arose to stop, render aid and report the accident. The jury was entitled to decide that his duty arose at any time during the time period between when he struck the victim and when he left the scene. There was one discrete actleaving the scene of the accident with knowledge he was involved in an injury-producing accidentand the jury need not have agreed when, before he left, his knowledge arose.

IV. INSTRUCTION UNDER CALCRIM NO. 2140

Anderson asserts the court erred by instructing the jury under CALCRIM No. 2140, without further instructing the jury he had no duty to assist Milligan if others were already providing aid. This contention is unavailing.
CALCRIM No. 2140, which sets forth the elements of felony hit and run, contains an optional, bracketed statement that "[t]he driver is not required to provide assistance that is unnecessary or that is already being provided by someone else. However, the requirement that the driver provide assistance is not excused merely because bystanders are on the scene or could provide assistance."
However, Anderson did not request this amplifying instruction at trial. Accordingly, he has forfeited the right to raise this issue on appeal. (People v. Hudson (2006) 38 Cal.4th 1002, 1011-1012 [44 Cal.Rptr.3d 632, 136 P.3d 168].)
(8) Moreover, even if we were to reach the merits of this issue, we would reject Anderson's claim of error as this proposed instruction is not supported by the evidence in this case. In People v. Scheer (1998) 68 Cal.App.4th 1009 *929 [80 Cal.Rptr.2d 676], the defendant similarly argued on appeal that the trial court erred in failing to amplify the standard CALJIC instruction on the elements of felony hit and run (CALJIC No. 12.70) by adding language similar to the bracketed portion of CALCRIM No. 2140, quoted ante. (Scheer, supra, 68 Cal.App.4th at pp. 1026-1027.) The Court of Appeal rejected this contention, holding it was unsupported by the evidence: "The undisputed evidence reflects appellant fled the scene within a minute or two after the collision and made no attempt either to exit his car or to ascertain either the condition of the victims or whether any of the bystanders were in fact rendering the kind of assistance mandated by [the Vehicle Code]. [¶] We hold the driver's duty to render necessary assistance under [the Vehicle Code], at a minimum, requires that the driver first ascertain what assistance, if any, the injured person needs, and then the driver must make a reasonable effort to see that such assistance is provided, whether through himself or third parties. [Citation.] [¶] Obviously, where, as here, the driver flees the scene without inquiring about or otherwise investigating the victims' condition, he has failed to perform the first step. [Citation.] Additionally, the mere presence of bystanders who arguably gathered to aid the victims does not guarantee that the injured person will receive all necessary aid. In some instances, for example, a bystander may be willing, but not physically capable, of removing the victim from the wreck, or a bystander may be willing to call for help but no phone is available yet is not willing to transport the victim to a medical facility. [¶] In view of the foregoing, we further conclude that appellant was not entitled to an amplifying instruction to the effect that his duty to render necessary assistance was obviated because such assistance was rendered by others. The fortuitous fulfillment of the driver's duty to render reasonable assistance to the injured victim or victims by Good Samaritans cannot operate to exonerate the driver and nullify the fact such duty was breached by the driver. To reach a contrary conclusion would impermissibly immunize the driver from the penal consequences of such breach and encourage scofflaws to violate both the letter and spirit of the law." (Scheer, supra, 68 Cal.App.4th at pp. 1028-1029, italics added.)
Likewise in this case, Anderson did not stop to check the condition of Milligan or ascertain what, if any, aid he needed. Rather, he left the scene within minutes of the accident, claiming he did not see Milligan and did not see anyone who had stopped to assist Milligan. It was Anderson's contention he did not even know he had hit a person until his girlfriend and her brother told him. The fortuitous fulfillment of his duty by others, i.e., Gilbride, who arrived at the accident shortly after it occurred and telephoned for assistance, cannot exonerate Anderson and nullify his initial breach.

*930 V. COURT'S REFUSAL TO REOPEN DEFENSE CASE

Anderson asserts the court erred in refusing to allow him to reopen his case after closing arguments to allow him to investigate the veracity of Officer Whitman's testimony concerning the density and height of the hedges along Fletcher Parkway and his opinion it would be very difficult for a person to see through them to the roadway from the mall parking lot. We reject this contention.

A. Background

Following closing argument, defense counsel requested that he be allowed to reopen his case to investigate the state of the hedges between the mall parking lot and Fletcher Parkway. Counsel indicated that although there were very dense hedges just next to the collision site, Anderson believed there were very few shrubs to the east of the accident site, where he claimed he drove in the mall parking lot after the accident. Counsel stated that he and Anderson each drove out to the scene after closing argument and confirmed that area at present did not have any dense hedging. Counsel requested that they be allowed to investigate the existence and nature of the hedging in place on the night of the accident by sending out an investigator and comparing aerial photographs taken shortly after the accident. The court denied the motion.

B. Analysis

(9) A trial court has discretion to order a case reopened to permit the introduction of additional evidence. (People v. Funes (1994) 23 Cal.App.4th 1506, 1520 [28 Cal.Rptr.2d 758].) "In determining whether a trial court has abused its discretion in denying a . . . request to reopen, the reviewing court considers the following factors: `(1) the stage the proceedings had reached when the motion was made; (2) the [requesting party's] diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' [Citation.]" (People v. Jones (2003) 30 Cal.4th 1084, 1110 [135 Cal.Rptr.2d 370, 70 P.3d 359].) If error is found, the court must then assess any prejudicial effect. (Id. at pp. 1111, 1117.)
Here, the late stage of the proceedings, the lack of significance of the potential evidence, and the lack of diligence by defense counsel compel the conclusion the court did not err in refusing to let the defense reopen its case. The characteristics of the hedges and shrubbery along Fletcher Parkway were discussed throughout the trial. Several witnesses testified to the existence of the hedges and shrubbery in both the area of the accident and where *931 Anderson alleged he drove. There were multiple photographs admitted into evidence, including defense exhibits, which depicted the area. At all times during the trial, both sides understood the significance of the hedges and shrubbery and their relationship to Anderson's ability to see the road from the mall parking lot. The defense had ample opportunity to explore the state of the hedges and shrubbery both before and during Anderson's defense case. The area had been so thoroughly explored that when Officer Whitman testified in rebuttal, defense counsel did not cross-examine him. In sum, the court did not err in refusing to let Anderson reopen his defense case after oral arguments.

VI. RESTITUTION ORDER

Anderson asserts that the court erred in ordering that, as a condition of probation, he be ordered to pay restitution for expenses related to Milligan's injuries and death. Specifically, he asserts the order was improper because these expenses were not caused by and had no relation to the crime for which he was convicted. This contention is unavailing.

A. Background

The trial court, as a condition of probation under Penal Code section 1203.1, ordered Anderson to pay Sharp Memorial Hospital the costs incurred as a result of its treatment of Milligan for his injuries before he died. The court further ordered Anderson to pay Milligan's family's funeral expenses as a condition of probation. The total amount of the restitution order was $34,092.02.

B. Standard of Review

(10) Penal Code section 1203.1 gives trial courts broad discretion to impose conditions of probation to foster rehabilitation of the defendant, protect the public and the victim, and ensure that justice is done. (Pen. Code, § 1203.1, subd. (j); Brown v. Superior Court (2002) 101 Cal.App.4th 313, 319 [124 Cal.Rptr.2d 43].) "A condition of probation will not be held invalid unless it `(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' [Citation.] Conversely, a condition of probation which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." (People v. Lent (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545], fn. omitted (Lent), quoting People v. Dominguez (1967) 256 Cal.App.2d 623, 627 [64 Cal.Rptr. 290].) As with any exercise of *932 discretion, the court violates this standard when it imposes a condition of probation that is arbitrary, capricious or exceeds the bounds of reason under the circumstances. (People v. Carbajal (1995) 10 Cal.4th 1114, 1121 [43 Cal.Rptr.2d 681, 899 P.2d 67] (Carbajal).)

C. Analysis

Anderson asserts that his criminal act was in leaving the scene, and section 20001 does not require a showing that he caused Milligan's injuries, death, and the related funeral expenses. (People v. Escobar (1991) 235 Cal.App.3d 1504, 1509 [1 Cal.Rptr.2d 579] ["The gravamen of a section 20001 offense... is not the initial injury of the victim, but leaving the scene without presenting identification or rendering aid."].) However, the identical argument asserted by Anderson was raised by the defendant in Carbajal, supra, 10 Cal.4th 1114, and rejected by the California Supreme Court.
(11) However, in imposing restitution as a condition of probation, "[a] court may also consider crimes which were charged but dismissed [citation]; uncharged crimes, the existence of which is readily apparent from the facts elicited at trial [citation]; or even charges of which the defendant was acquitted, if justice requires they be considered. [Citation.]" (People v. Goulart (1990) 224 Cal.App.3d 71, 79 [273 Cal.Rptr. 477].) This is because probation is an "`"act of clemency and grace,"'" not a matter of right. (People v. McGavock (1999) 69 Cal.App.4th 332, 337 [81 Cal.Rptr.2d 600].) "[T]he granting of probation is not a right but a privilege, and ... if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense[,] he is free to refuse probation." (People v. Miller (1967) 256 Cal.App.2d 348, 356 [64 Cal.Rptr. 20]; see also In re Osslo (1958) 51 Cal.2d 371, 377 [334 P.2d 1].) Because a defendant has no right to probation, the trial court can impose probation conditions that it could not otherwise impose, so long as the conditions are not invalid under the three Lent criteria. It is not limited to damages specifically caused by the crime of which the defendant was convicted.
(12) In Carbajal the high court held that a trial court may order a defendant convicted of hit and run to pay, as a condition of probation, "restitution to the owner of the property damaged in the accident from which the defendant unlawfully fled." (Carbajal, supra, 10 Cal.4th at p. 1119.) The court reasoned that the damage the defendant caused to the parked car during the hit and run accident was "reasonably related" to the crime of hit and run. (Id. at p. 1123.) As the court in Carbajal put it, "[b]y leaving the scene of the accident, the fleeing driver deprives the nonfleeing driver of his or her right to have responsibility for the accident adjudicated in an orderly way according to the rules of law. This commonly entails a real, economic loss, not just an *933 abstract affront. Among other things, the crime imposes on the nonfleeing driver the additional costs of locating the fleeing driver and, in some cases, the total costs of the accident. `The cost of a "hit and run" violation is paid for by every law-abiding driver in the form of increased insurance premiums. The crime with which the defendant is charged is complete upon the "running" whether or not his conduct caused substantial or minimal (or indeed any) damage or injury; it is the running which offends public policy.' [Citation.]" (Id. at p. 1124.)
The court also concluded that in the probation setting "restitution is also related to the goal of deterring future criminality. By seeking to force the defendant to accept the responsibility he attempted to evade by leaving the scene of the accident without identifying himself, the restitution condition acts both as a deterrent to future attempts to evade his legal and financial duties as a motorist and as a rehabilitative measure tailored to correct the behavior leading to his conviction." (Carbajal, supra, 10 Cal.4th at p. 1124.)
Likewise in this case the court did not abuse its discretion in ordering restitution as a condition of probation. Because the jury necessarily found, as an element of the crime of felony hit and run, that Anderson was involved in an accident that resulted in injury or death, the restitution order was reasonably related to the expenses related to Milligan's injuries and death. Further, the order serves the purpose of deterring future criminality. The order forces Anderson to confront, in concrete terms, the harm his actions have caused.
Further, Anderson's reliance on People v. Scroggins (1987) 191 Cal.App.3d 502 [236 Cal.Rptr. 569] for the proposition there is a causation element in restitution orders is misplaced. In reaching this conclusion, the Scroggins court relied upon People v. Richards (1976) 17 Cal.3d 614, 619-620 [131 Cal.Rptr. 537, 552 P.2d 97], which narrowly construed a trial court's authority to impose restitution for damages that were not specifically caused by the defendant's criminal conduct. (Scroggins, supra, 191 Cal.App.3d at pp. 506-507.) However, in Carbajal, our high court expressly disapproved this portion of the Richards decision. (Carbajal, supra, 10 Cal.4th at p. 1126.)
Following submission of this matter the Third District Court of Appeal held, in a published opinion, that a hospital that treated a victim injured by a defendant is itself not a "victim" for purposes of restitution under Penal Code section 1202.4, subdivision (f). (People v. Slattery (2008) 167 Cal.App.4th 1091, 1096-1097 [84 Cal.Rptr.3d 672] (Slattery).) Based upon this decision, Anderson asserts, in a petition for rehearing, the court erred in ordering him to pay $31,397.55 to Sharp Memorial Hospital for the costs of treating the victim Milligan. Anderson's reliance on Slattery is misplaced.
*934 In this case, Anderson was granted probation, whereas in Slattery the defendant was sentenced to state prison. That distinction is critical to our analysis.
As discussed, ante, probation is an "`"act of clemency and grace,"'" not a matter of right. (People v. McGavock, supra, 69 Cal.App.4th at p. 337.) "[T]he granting of probation is not a right but a privilege, and ... if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense[,] he is free to refuse probation." (People v. Miller, supra, 256 Cal.App.2d at p. 356.) Because a defendant has no right to probation, the trial court can impose probation conditions that it could not otherwise impose, so long as the conditions are not invalid under the three Lent criteria. Thus, even if in cases where a defendant is sentenced to state prison a hospital is not considered a victim for purposes of restitution, under Carbajal and Lent, the court properly exercised its discretion to order restitution to the hospital that treated Milligan because he was unable to pay those expenses. Forcing the hospital to bear those expenses, under the facts of this case, would defeat the purposes of the restitution statutes where restitution was ordered as a condition of probation.
Further, to the extent Slattery intended its holding to be broad enough to include restitution orders where probation is granted, we decline to follow its holding. In reaching its decision, the Slattery court relied heavily on People v. Birkett (1999) 21 Cal.4th 226 [87 Cal.Rptr.2d 205, 980 P.2d 912], in which the California Supreme Court held that a court could not order restitution as a condition of probation to be paid to insurance companies that paid out claims to the defendant's victims whose cars were stolen. (Id. at pp. 234-235.)
(13) Here, however, the victim was not an insurance company but the direct provider of emergency medical services to the victim. Insurance companies conduct risk assessments and enter into contracts in which they promise to cover certain losses in exchange for premiums. A hospital, by contrast, when presented with a gravely injured victim, has an obligation to treat the victim regardless of whether the victim has insurance or the costs of care will ever be recoverable. (See Prospect Medical Group, Inc. v. Northridge Emergency Medical Group (2009) 45 Cal.4th 497, 501-502, 504 [87 Cal.Rptr.3d 299, 198 P.3d 86].) When a hospital suffers this type of economic loss as a result of a defendant's criminal acts it is a direct victim.
The court did not err in imposing its restitution order.

*935 DISPOSITION
The judgment is affirmed.
Huffman, Acting P. J., and Irion, J., concurred.
NOTES
[1] All further statutory references are to the Vehicle Code unless otherwise specified.
[2] Gilbride was ruled unavailable for the second trial, and his testimony from the first trial was read to the jury.
[3] The Honorable Christine K. Goldsmith.
[4] Evidence Code section 402, subdivision (b) provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."
[5] The Honorable Allan J. Preckel.