Filed 8/25/14  P. v. Colondres CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Nevada)

----

| | |
|---|---|
| THE PEOPLE, | C073793 |
| Plaintiff and Respondent, | (Super. Ct. No. SF11-299) |
| v. | |
| DANIEL LUCAS COLONDRES, | |
| Defendant and Appellant. | |

Defendant Daniel Lucas Colondres challenges his sentence and conviction following a jury trial in which he was found guilty of attempted murder, attempted manslaughter, burglary, multiple counts of stalking, criminal threats, dissuading a witness, interfering with a communication device, and vandalism.  Specifically, defendant contends (1) we should strike the enhancement for personal use of a deadly and dangerous weapon on count IV (criminal threats) because the enhancement was not alleged or instructed on that count; (2) there is insufficient evidence the attempted murder

1

was willful, deliberate or premeditated; and (3) defendant's sentence on count VIII (interference with communication device) should be stayed because it was committed as part of a single course of conduct with the same objective as count VII (dissuading a witness). We agree execution of defendant's sentence on count VIII should be stayed but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant first met Shanti Reynolds when he was a high school student participating in a program at the hospital where Reynolds worked as a nurse. When his grandfather died, Reynolds invited defendant to live with her in one of her spare bedrooms, which he did for several months. Defendant moved out of Reynolds's house in early 2006 after they had a disagreement about his attempt to kiss her. Reynolds did not hear from defendant again until late 2010, when he asked if he could come live with her again because he was having a difficult time. She allowed him to move back in for two months so he could find a job and a place to live. The arrangement worked fine in the beginning, but then defendant became involved with Reynolds's friend and neighbor, Kendra Bishop.[1]

Reynolds originally sent defendant to Kendra's house to do some fence work, but Reynolds began to notice that defendant was sneaking out late at night. She eventually learned defendant and Kendra were having an extramarital affair and Reynolds fought with defendant and Kendra about it. At that point, Reynolds dropped defendant's belongings at Kendra's house with the intent defendant would no longer live with her and she asked him to return the key to her house.

---

[1] Multiple witnesses share the same surnames in this case. For clarity and convenience, we refer to them by their first names. We intend no disrespect.

2

However, throughout early 2011, defendant continued to enter Reynolds's house on at least five separate occasions; she believed he was entering through a dog door. In March 2011, he also took her car from her closed garage without permission. After returning the car, he trespassed onto Reynolds property and entered her locked house without permission while she was present and proceeded to yell at her. She attempted to call 911 but defendant took the phone from her and refused to let her use it. Reynolds unsuccessfully attempted to taze defendant. Reynolds eventually pressed the panic button on her alarm system, and defendant threatened that his gang friends were outside and would shoot her or anyone coming to the house, including the police. Defendant fled before law enforcement arrived.

In April 2011, Reynolds began the process of obtaining a restraining order against defendant, and the court issued that order in May 2011. John Bishop (Kendra's husband) served the restraining order on defendant. Reynolds was spurred to initiate the process after an incident where defendant stole her garden lights and broke into her house while she was present, wearing a mask, hat, and dark-colored outfit. When she informed him she had called the police, defendant asked Reynolds to open the door for him so he would not leave any fingerprints. When she refused, he pulled his sleeve over his hand and used it to open the door. When law enforcement arrived, he was gone.

In early May 2011, John came to Reynolds's house to speak with her. Shortly thereafter, defendant again appeared in her house; this time he wore a black mask, gloves, and a camouflage jacket, and he carried a hammer and a screwdriver. Defendant said he wanted to speak with Reynolds and to fight John. When John refused, defendant left and Reynolds called the police. When officers arrived, they found that two tires on John's truck had been punctured and were flat.

Then, in July 2011, Reynolds received a phone call that defendant was making calls from her residence. She called a neighbor, Jeff Love, who confirmed defendant was

3

in her house.  Officers were dispatched and contacted defendant in Kendra's back yard. Defendant was aware of the restraining order but had gone to Reynolds's house to wait for her until she came from work regardless.

On August 19, 2011, Kendra picked defendant up from work and brought him to her house.  They had dinner and both began drinking.  Kendra went to bed and awoke to defendant kneeling next to her bed with a sewing box in his hand.  He began swearing at her and punched the light above her bed.  He stormed out and punched holes in the hallway walls, closets, and cabinets.  Before he left, defendant told her he thought her husband John was at Reynolds's house and that he was going to go over there and kill him.  Kendra tried to explain to him that John was not at Reynolds's house and assumed he was not being serious, but was drunk.  Defendant acknowledged he knew John was not at Reynolds's house that night.  Defendant took two knives from Kendra's kitchen drawers before leaving.

Shortly thereafter, Reynolds was awakened by her dog running across her bed. She looked over and saw a shadow leaning over her paramour, Taylor George, who was asleep in the bed next to her.  Reynolds recognized the figure as defendant, who was wearing a black hat, black mask, black jacket, black gloves, and black pants.  Defendant held a knife in his hand, which was raised over his head.  Reynolds ran across the bed and began pushing defendant, who started punching George in the head.  Reynolds turned on the light and recognized the knife in defendant's hand as one from the Bishop residence. Defendant attacked them both and said "[w]e're all going to die tonight."

In the fracas, Reynolds was cut by holding the serrated edge of the knife in her hand to keep defendant from stabbing her, and was ultimately stabbed in the hand, knee, and foot.  Defendant stabbed George in the chest and back, and George also had defensive wounds on his hand from holding the blade of the knife.  Reynolds screamed for help, and a few minutes later her neighbor, Pamela Love, came into the room and

4

shouted at defendant to leave. But defendant continued to attack George with the knife. Jeff came seconds later wielding a golf club. Jeff hit the knife out of defendant's hand using the golf club, and when defendant continued to attack George and Reynolds, Jeff hit defendant on the side of the head with the golf club, twice.

Defendant fled from Reynolds's house leaving behind the bloodied knives. Law enforcement located him a few hours later, asleep on the floor of Kendra's laundry room, smelling of alcohol. When his blood was tested at the hospital approximately an hour after he was taken into custody, defendant's blood-alcohol level was 0.24 percent.

Defendant was charged with the willful, deliberate and premeditated attempted murders of George and Reynolds (Pen. Code, §§ 187, subd. (a), 664, subd. (a)—counts I & II);[2] residential burglary (§ 459—count III) in violation of section 462, subdivision (a); criminal threats (§ 422—count IV); stalking (§ 646.9, subd. (a)—counts V & VI); dissuading a witness by force or threat (§ 136.1, subd. (c)(1)—count VII); interference with a wireless communication device (§ 591.5—count VIII); vandalism (§ 594, subd. (a)— count IX); and disobeying a domestic relations court order (§ 273.6, subd. (a)— count X).[3] Defendant was also alleged to have personally inflicted great bodily injury (§ 12022.7, subd. (a)) in committing counts I and II; and to have personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1) (hereafter section 12022(b)(1)) in committing counts I through III. It was further alleged that counts I through IV are serious felonies (§ 1192.7, subd. (c)) and counts I through III are violent felonies (§ 667.5, subd. (c)). The information also alleged defendant was not eligible for probation on counts I through IV because of his prior felony convictions. (§ 1203, subd. (e)(4).) Defendant pleaded not guilty and denied all enhancement allegations.

---

[2] Undesignated statutory references are to the Penal Code.

[3] The People ultimately dismissed count X.

A jury found defendant guilty of attempted murder in count I, and found true the special allegations of deliberation and premeditation and use of a deadly weapon as to that count. On count II, the jury found defendant guilty of the lesser included offense of attempted voluntary manslaughter, and, as to that count, found true only the special allegation of use of a deadly weapon. The jury also found defendant guilty of first degree burglary as charged in count III, and found true the special allegations that a person was present and defendant used a deadly weapon as to that count. On count IV, the jury found defendant guilty of a criminal threat and found true that defendant used a deadly weapon in issuing that threat. The jury also found defendant guilty of two counts of stalking, witness dissuasion, tampering with a telephone, and vandalism (counts V through IX).

The court sentenced defendant to an aggregate determinate term of 92 months and a consecutive indeterminate term of 96 months to life, imposed various fines and fees, ordered defendant to pay restitution to the victims, and awarded defendant 672 days of presentencing credits (585 actual and 87 conduct days).

## DISCUSSION

### I. Section 12022(b)(1) Enhancement

Defendant claims the trial court erred in imposing a section 12022(b)(1) enhancement on count IV (criminal threats) because it was not alleged in the information. The People argue defendant forfeited his objection by not raising it in the trial court. Generally, the failure to raise an issue in the trial court precludes raising it on appeal. (*People v. Maury* (2003) 30 Cal.4th 342, 427; *People v. Ferrel* (1972) 25 Cal.App.3d 970, 976.) Even assuming the issue involves unauthorized sentencing error, which may be raised on appeal (*People v. Smith* (2001) 24 Cal.4th 849, 852; *People v. Scott* (1994) 9 Cal.4th 331, 354), the contention has no merit.

6

A person generally cannot be convicted of an enhancement not charged in the information.  (*People v. Moore* (1974) 11 Cal.3d 790, 792; *People v. Ford* (1964) 60 Cal.2d 772, 794; *In re Hess* (1955) 45 Cal.2d 171, 174-175.)  However, "where the information puts the defendant on notice that a sentence enhancement will be sought, and further notifies him of the facts supporting the alleged enhancement, modification of the judgment for a misstatement of the underlying enhancement statute is required only where the defendant has been misled to his prejudice."  (*People v. Neal* (1984) 159 Cal.App.3d 69, 73.)

We find *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*) instructive on this issue.  In *Riva*, the information alleged a section 12022.53, subdivision (d) enhancement with respect to two counts that charged the defendant with attempted voluntary manslaughter and assault with a firearm, but not with respect to a count of shooting at an occupied vehicle.  The verdict forms asked the jury to determine the truth of the enhancement on all three counts.  The defendant did not object and the jury found the allegation true for all counts.  The trial court imposed the enhancement even as to the count for which it was not alleged.  (*Riva*, at pp. 1000-1001.)

The appellate court affirmed, even though section 12022.53, subdivision (j) requires that for the enhancement to apply it must "be alleged in the accusatory pleading."  The court's interpretation of that statute was that it "only requires the facts necessary to sustain the enhancement be alleged in the information; it does not say where in the information those facts must be alleged or that they must be alleged in connection with a particular count in order to apply to that count.  In [*Riva*] the prosecution complied with the literal language of the statute by alleging the enhancement in the information as to the charges of attempted voluntary manslaughter and assault."  (*Riva*, *supra*, 112 Cal.App.4th at p. 1001, fn. omitted.)

7

The appellate court found that by pleading the enhancement in other counts, the prosecution put the defendant on notice he was being charged with the enhancement. Nor did the failure to plead the enhancement abrogate the defendant's ability to challenge the factual basis of the enhancement; he was on notice from the allegation of the enhancement in other counts that he had to defend against the allegation that he intentionally fired a firearm and proximately caused great bodily injury.  (*Riva*, *supra*, 112 Cal.App.4th at pp. 1002-1003.)

Here, defendant was placed on notice that he would have to defend against the allegation that he used a knife in the commission of his August 19-20, 2011 crimes because the enhancement was alleged in counts I, II and III of the information.  Also, the evidence showed defendant used a deadly weapon, a knife, in issuing the criminal threat to Reynolds and George, "We're all going to die tonight."  Neither defendant nor the record suggests defendant would have defended the case any differently if the enhancements had been alleged as to all four counts.  Further, there was no objection to the court's giving the verdict forms to the jury for the section 12022(b)(1) enhancement as to count IV, and the jury found the enhancement true as to that count.  Thus, the court did not err in imposing a sentence on the enhancement as to count IV.

## II.  Evidence of Attempted Murder of George

Defendant contends "the evidence was insufficient to support a finding that the attempted murder of Taylor George was done with premeditation and deliberation" as required by sections 189 and 664, subdivision (a).  He does not dispute the attempted murder verdict but defendant claims there is insufficient evidence of motive to kill George (as opposed to John), and that the manner of the attack does not indicate the requisite degree of premeditation.  While we accept defendant's contention that his expressed desire and motive to kill John cannot be used as evidence of a motive to kill George (*People v. Bland* (2002) 28 Cal.4th 313, 327-328; *People v. Stone* (2009)

8

46 Cal.4th 131, 141), we still find substantial evidence to support the jury's finding that defendant's attempted murder of George was willful, deliberate, and premeditated.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].)  We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)  A conviction will not be reversed for insufficient evidence unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

"Deliberate" means " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 862-863.)  "Premeditated" means " ' "considered beforehand." ' " (*Id*. at p. 863.)  "Premeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*Ibid*.)  In determining whether the evidence supports an inference that the attempted murder occurred as a result of preexisting reflection, rather than unconsidered or rash impulse, appellate courts consider, among other things, evidence of the manner of killing, motive, and planning activity.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332.)  And we consider the evidence in the light most favorable to the judgment.  (*Id*. at p. 331.)

Here, substantial evidence supports the jury's finding that defendant's attack of George was willful, deliberate, and premeditated.  Defendant dressed in black, put on

9

gloves, and donned a mask to hide his identity before going to Reynolds's house in the middle of the night. (See *People v. Woods* (1992) 8 Cal.App.4th 1570, 1595 [donning a mask was evidence of planning, showing murder was premeditated and deliberate].) He armed himself with two knives from the Bishops' home immediately before going to Reynolds's home and attacking George. (*People v. Morris* (1988) 46 Cal.3d 1, 23 ["Defendant's possession of a weapon in advance of the killing" showed planning], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 544, fn. 5]; *People v. Millwee* (1998) 18 Cal.4th 96, 134-135 ["ample opportunity . . . to consider whether and how to use lethal force" showed premeditation].) And George was asleep and posed no threat to defendant when defendant stood over him holding a knife and began hitting him in the head. (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 ["The utter lack of provocation by the victim is a strong factor supporting the conclusion that appellant's attack was deliberately and reflectively conceived in advance."].)

Additionally, defendant knew John was not at Reynolds's residence and recognized that the man in bed with Reynolds was not John, but he proceeded with his attack anyway. (*People v. Stone, supra,* 46 Cal.4th at p. 140 ["a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind"].) Further, while it is entirely probable defendant was motivated by jealousy of Reynolds's amorous relationship given his escalating pattern of stalking Reynolds, the lack of a clear motive to kill George is not fatal to our analysis. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [premeditation and deliberation found on strong showing of planning, or on evidence of motive combined with lesser showing of planning or manner of killing indicating " 'preconceived design' " to kill].)

Based on the foregoing, we find there was sufficient evidence for the jury to find defendant committed the attempted murder of George willfully, deliberately, and with premeditation.

10

### III. Section 654 Stay of Count VIII

Defendant contends, and the Attorney General agrees, the court should have stayed execution of defendant's sentence on count VIII (interference with a communication device) pursuant to section 654. We concur and modify the judgment.

Section 654 provides, in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Thus, the statute bars multiple punishments for multiple acts where those acts comprise an indivisible course of conduct incidental to a single criminal objective and intent. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) "Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor." (*People v. Beamon* (1973) 8 Cal.3d 625, 637, italics omitted.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

Here, defendant prevented Reynolds from reporting his unlawful presence in her home by taking and breaking her telephone. Both acts were committed simultaneously, in a single act, with a single objective. Accordingly, we stay execution of defendant's sentence on count VIII.

### DISPOSITION

The judgment is modified to stay execution of defendant's sentence on count VIII; in all other respects, the judgment is affirmed. We direct the trial court to prepare an

11

amended abstract of judgment and to forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

                                                         BUTZ          , J.

We concur:

      BLEASE        , Acting P. J.

       HOCH         , J.