Filed 6/30/16  P. v. Diaz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTIAN ESTELMAN DIAZ,<br><br>    Defendant and Appellant. | G052142<br><br>(Super. Ct. No. FVA700187)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Gerard S. Brown, Judge.  Affirmed.

Tomas Requejo for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Defendant Christian Estelman Diaz was jointly tried with Jesus Sanchez for the murder of Michael McCoy and the attempted murders of Justin Haston, Jonell Buckley, and Jerome Franks. A jury acquitted Sanchez but found defendant guilty on all counts. In addition, the jury returned true findings on firearm and criminal street gang allegations. The trial court denied defendant's motion for a new trial and, based on the jury's verdicts and findings, sentenced him to an indeterminate term of 120 years to life in state prison with an additional 40-year determinate term.

FACTS

*Background*

Around 8:00 p.m. on February 23, 2007, McCoy and Haston were sitting in McCoy's car parked outside a convenience store in Rialto, California. Haston testified that a man he described as Hispanic, six-feet one-inch in height, weighing 200 pounds, with a thin mustache, approached the driver's side door. The man tapped on the window and said, "[W]here we're from?" McCoy said, "I don't bang," while Haston responded, "Rialto." The man then displayed a saw-off shotgun and fired a shot through the window. The blast killed McCoy.

When Haston saw the man display the shotgun, he jumped out of the car and fled. The man followed, firing several rounds in Haston's direction. Although struck by some pellets in his arm and back, Haston successfully eluded his pursuer.

About the same time, Franks, Buckley, and their four children were in a minivan driving along a street near the convenience store. Franks testified he saw a man carrying what he initially thought was a pole walking in the opposite direction along the adjacent sidewalk. As the man came closer, Franks realized that he was holding a shotgun. The man stepped into the street in front of the minivan, pointed the weapon at

the vehicle, and yelled, "Stop the God damn car." After Franks stopped the minivan, the man walked to the driver's side and unsuccessfully tried to open the door. He then demanded Franks open the door. Franks replied, "I have kids in the car." The man stepped back, aimed the shotgun at the minivan, and fired a shot. Both Franks and Buckley were struck by the blast. Franks sped away going to a hospital where Buckley underwent emergency surgery for her injuries.

Franks described the man as Hispanic with a slender build, standing about five feet 11 inches tall, and wearing a dark-colored hoodie. He did not see any facial hair and claimed the man appeared to have a shaved head. "The hood was not covering his whole head . . . and I seen the top part of his head that looked shaven . . . ." Buckley testified the man was White and wore a black hoodie. She also denied seeing any facial hair and said the portion of the man's head that was not covered by the hoodie appeared to be shaved.

Within a week of the shootings, defendant and Sanchez were arrested. The prosecution's theory of the case was that defendant, a member of a street gang named South Los, committed the shootings to retaliate against a rival gang named Southside Rialto for the murder of a South Los member.

Gricelda Jimenez testified defendant admitted to her that he belonged to South Los. Defendant had a close relationship with another South Los gang member named Riley Hurtado. In February 2007, Hurtado was killed. Jimenez testified defendant called her and said someone close to him had been killed by "the rats," a term he used to refer to Southside Rialto.

Sanchez was prosecuted on the theory he aided and abetted defendant in committing the shootings. At trial, the prosecution called Michelle Romero as a witness. Romero said that after Sanchez was arrested, she visited him at the detention center. During the visit, Romero asked Sanchez, "Did you do it?" Sanchez "nodded no." Over a

3

defense objection, Romero was allowed to testify that she asked, "Was it Chris?" and Sanchez "nodded yes." Romero then asked Sanchez if he was the driver and he nodded yes. Sanchez wrote on a piece of paper, "If they don't have a weapon, they don't have a case."

The police impounded the vehicle defendant and Sanchez were in at the time of their arrest. A subsequent search of the vehicle resulted in the discovery of a shotgun shell identical to the spent shells recovered from the convenience store parking lot and in the nearby street.

The day defendant and Sanchez were arrested, the police questioned each of them. The two were then placed in a room together. A video and audio recording of their interaction and statements was played for the jury trial.

According to the prosecutor, when Sanchez entered the room defendant pointed to the ceiling purportedly to warn Sanchez about the possibility the police were recording their conversation. Several times the two whispered inaudible comments to each other. At one point, defendant said, "They're trying to say we lost one." Later, he mentioned the police "found a shotgun shell . . . like fuck I don't know where that fucking came from. Shit (inaudible) they don't got the strap[, i.e. gun], they don't got shit . . . ."

*Identification of Defendant as the Shooter*

The primary issue at trial was whether defendant was the man wielding the shotgun on the night of February 23, 2007.

The police showed Haston, Franks, and Buckley two different photographic lineups in the days after the shooting. The first lineup did not contain a photograph of defendant. Haston and Franks chose the photograph of another person from the first lineup. Haston claimed that he "felt pressured" to pick someone and told the officer he

4

was 75 percent sure of his choice. Franks also felt "rushed into" making a decision and told the officer that he was not "sure" the person he chose was the gunman. Buckley did not choose anyone from the first lineup.

Shown a second photographic lineup that contained defendant's picture, all three witnesses identified him as the gunman. The pictures of defendant and the other persons contained in the second lineup were obtained from the Department of Motor Vehicles. The officer who prepared the lineup testified she declined to use defendant's booking photograph because she felt it would be suggestive.

Both Haston and Franks also testified at the preliminary hearing. Haston failed to identify defendant as the shooter during the preliminary hearing and denied he was the gunman at trial. The prosecution questioned Haston about his own criminal record, which included three felony convictions. Haston admitted that he had been in jail at the time of the preliminary hearing and was serving time on his most recent conviction when called to testify at trial. He acknowledged having associated with a gang in the past and knew that in the gang subculture a person could be hurt or killed for testifying against a gang member. However, Haston denied having been threatened by anyone.

During the preliminary hearing, Franks initially identified Sanchez as the gunman, but later changed his testimony and identified defendant. Franks explained that he and Sanchez "had an eye thing going on and he was looking at me in an awkward way and I was looking back at him not focussing (*sic*) on what I should be focussing (*sic*) on and I made the wrong decision." At trial, both Franks and Buckley identified defendant as the gunman.

*Defendant's Motion for New Trial*

After the jury returned its verdicts, defendant retained new counsel and filed a motion for new trial. The motion cited three grounds: 1) newly discovered

5

evidence consisting of testimony of an alleged tainting of Franks and Buckley's in-court identification of him, plus trial counsel's failure to introduce his booking photograph; 2) error of law resulting from the trial judge's pretrial ruling concerning the admission of Sanchez's responses to Romero's queries; and 3) deprivation of defendant's constitutional right to testify in his own defense. The trial court conducted a hearing on the motion, received documentary material and heard from Sanchez's aunt, defendant's mother, and trial counsel for both Sanchez and defendant.

In a supporting declaration, defendant asserted his trial attorney never visited him at the jail, only spoke with him for a few minutes at court hearings, did not discuss trial strategy with him, and refused his request to testify during trial.

According to Sanchez's aunt and defendant's mother, they were in the courtroom the day testimony was to begin. Before the trial judge took the bench, they observed Franks and Buckley sitting in front of them talking to each other and gesturing in the direction of defendant. Defendant's mother claimed her daughter prepared a letter for her that she handed to defendant's trial attorney. Counsel for both Sanchez and defendant acknowledged learning about this incident during trial. Defendant's trial attorney testified, "I didn't think it was relevant at the time, so I didn't do anything." Defendant's trial attorney admitted she knew about defendant's booking photograph and "had always wanted to use it as a piece of evidence."

The trial court denied the motion.

## DISCUSSION

### 1. Introduction

Before discussing the merits of the appeal, we note numerous deficiencies in appellate counsel's opening brief have rendered our review of this case difficult.

6

First, the brief's statement of facts fails to summarize the evidence presented at trial, is argumentative, and, without acknowledging it, conflates the trial testimony with testimony presented at the posttrial new trial motion. Second, in violation of rules 8.204(a)(1)(C) and 8.360(a) of the California Rules of Court, the opening brief is nearly bereft of supporting record references. What's more, the few references contained in the brief are not to the official appellate record, but apparently counsel's copy of the transcripts. Finally, many of the brief's arguments lack citation of any supporting legal authority. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1029 ["""[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration."""]; *People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

These defects notwithstanding, we shall proceed to review and decide each of the opening brief's arguments on the merits.

*2. Ineffective Assistance of Counsel*

Defendant challenges the competency of his trial attorney on several grounds.

The governing standards of appellate review of an ineffective assistance of counsel claim are well settled. """"In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]""" (*People v. Johnson* (2016) 62 Cal.4th 600, 653; *Wiggins v. Smith* (2003) 539 U.S. 510, 521 [123 S.Ct. 2527, 156 L.Ed.2d 471].)

In conducting our review, we begin with the "presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland v.*

*Washington* (1884) 466 U.S. 668, 689 [104 S.Ct. 2052, 80 L.Ed.2d 674]), and thus accord great deference to trial counsel's tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) "'"""Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.'"""" (*Ibid.*)

"Further, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*People v. Carrasco* (2014) 59 Cal.4th 924, 982, quoting *Strickland v. Washington, supra*, 466 U.S. at p. 697.)

Defendant's first complaint is that his trial attorney never visited him at the jail and limited their communications to short conferences during court hearings. He contends this limited contact "would render any presentation at trial as ineffective."

The factual support for this claim was defendant's declaration and the jail's visitation records. Although defendant's trial attorney testified at the new trial hearing, she was only questioned about defendant's booking photograph and the information she received concerning the purported tainting of Franks's and Buckley's in-court identification. Nor does it appear defendant's newly retained attorney argued the matter during the hearing on the new trial motion.

Further, defendant fails to cite any legal authority supporting this ground. As the Attorney General notes, in the context of a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118), courts have held "'the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence.'" (*People v. Streeter* (2012) 54 Cal.4th 205, 230; *People v. Silva* (1988) 45 Cal.3d 604, 622 [defendant's attorney "had only seen him once"].)

Finally, we note "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the

accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (*United States v. Cronic* (1984) 466 U.S. 648, 658 [104 S.Ct. 2039, 80 L.Ed.2d 657].) Here, defendant's trial attorney actively participated in the trial, primarily focusing on the crucial issue of whether defendant was the gunman who killed McCoy and tried to kill Haston, Franks, and Buckley. She noted the discrepancies in the prior identifications of the eyewitnesses and the fact defendant did not fit their descriptions of the gunman. Counsel also emphasized the lack of other supporting physical evidence such as fingerprints from the minivan door handle and the absence of any laboratory analysis of the shotgun shells. Defendant has not shown her purportedly limited contact with him made her representation ineffective.

A second basis for defendant's ineffective assistance of counsel claim is that his trial attorney failed to use an identification expert. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland v. Washington, supra*, 466 U.S. at p. 691.) Given the obvious discrepancies in the eyewitnesses' descriptions of the gunman, the fact two of them initially identified another individual as their assailant and then, at least initially, failed to identify defendant at the preliminary hearing, we conclude counsel could decide consulting with or calling an identification expert in this case was unnecessary. This finding is buttressed by the trial court's giving CALCRIM No. 315, which lists the factors to be considered in evaluating the eyewitnesses' testimony and emphasizes the prosecution's burden to prove beyond a reasonable doubt defendant perpetrated the crimes.

Defendant's third complaint about his trial attorney's performance concerns her admitted failure to properly introduce his booking photograph at trial. As noted, she

9

acknowledged it had been her intent to use it, but she failed to establish a proper foundation for its admission. The picture of defendant used in the photographic lineup depicts him with a high forehead, closely cropped haircut, and mustache. In his booking photograph defendant has a fuller head of hair, a mustache, and a goatee.

Nonetheless, counsel's mistake was clearly harmless under any standard of review. The booking photograph would have allowed the jury to observe defendant's facial features and hair style within a few days of the shooting. But the jury viewed the video tape of defendant's conversation with Sanchez that occurred later the same day. During closing argument, trial counsel noted defendant's appearance in the video tape does not match the descriptions of him given by Franks and Buckley. "Take a look at that video and you will see what Mr. Diaz looked like. He had hair for one thing. . . . I'm not going to say a full head of hair or afro or anything like that, but just he has hair, you can see it, it's very visible, he has a mustache and a goatee. Take a look at that video. He doesn't match the initial description of these individuals." "The object of an ineffectiveness claim is not to grade counsel's performance." (*In re Cox* (2003) 30 Cal.4th 974, 1019.) To support a reversal of defendant's conviction for ineffective assistance of counsel, "the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 333; *Strickland v. Washington, supra*, 466 U.S. at p. 694.)

Finally, defendant complains trial counsel failed to investigate the allegation Franks' and Buckley's in-court identification of him was tainted by the fact they were observed in the courtroom together gesturing in his direction. His trial counsel testified at the hearing on the new trial motion that she was informed about the incident but "didn't do anything" about it because she "didn't think it was relevant at the time."

10

We conclude defendant has failed to establish his trial attorney's inaction was objectively unreasonable.  The alleged incident occurred before the hearing had started.  There is no indication Franks and Buckley remained in the courtroom after the trial judge took the bench and witnesses began testifying.  Both Franks and Buckley had already identified defendant as the gunman in a photographic lineup.  And Franks also identified him at the preliminary hearing, albeit after initially pointing to Sanchez.  Furthermore, both witnesses observed defendant sitting next to his attorney when they were called to testify during trial.

Thus, defendant fails to establish any of the foregoing claims support a reversal of his conviction.

*3. Defendant's Right to Testify*

In his declaration supporting the new trial motion, defendant asserted he wanted to testify at trial, but his trial attorney ignored his requests declaring her policy was not to call her clients as witnesses.  Defendant argued that, as a result, he was denied the constitutional right to testify in his own defense.  Relying on *People v. Enraca* (2012) 53 Cal.4th 735, the trial court rejected this claim.

On appeal, defendant repeats his claim, arguing that "he was unaware that he could testify even if his lawyer told him" otherwise.  Alternatively, defendant cites trial counsel's actions constituted ineffective assistance of counsel.

Both contentions lack merit.  "While the defendant has the right to testify over his attorney's objection, such right is subject to one significant condition:  The defendant must timely and adequately assert his right to testify." (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231.)  "'When the record fails to disclose a timely and adequate demand to testify, "a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was

11

deprived of that opportunity."'"' (*People v. Enraca, supra*, 53 Cal.4th at pp. 762-763; *People v. Alcala* (1992) 4 Cal.4th 742, 805-806.)

Defendant was admittedly aware of his right to testify. The first page of the clerk's transcript is an advisement of legal right signed by him that, in part, states, "I understand that I have a right to testify in my defense if I wish."

Furthermore, defendant's declaration contains several expressions of his displeasure with trial counsel's representation of him. However, he did not request a *Marsden* hearing on any of these matters. Nor did "[d]efendant . . . apprise the court he desired to testify at any time during the trial proceeding when the right could have been accorded him, instead he waited until an adverse verdict was rendered against him before advising the court he had really wanted to take the stand after all, then demanded a new trial—another chance before a new jury—on the ground his counsel had 'deprived' him of his right. The obvious unreasonableness of such an approach doubtless led to the established rule that a defendant who desires to take the stand contrary to the advice of his counsel must make proper and timely demand." (*People v. Guillen* (1974) 37 Cal.App.3d 976, 984-985; *People v. Alcala, supra*, 4 Cal.4th at p. 805 [rejecting violation of right to testify where the defendant argued "his attorneys had failed to advise him adequately regarding the relative benefits and disadvantages of a decision not to testify," and "this failure effectively prevented him from exercising his right to testify in his own defense"].)

Defendant's alternative argument challenging the competency of his trial counsel fares no better. To justify a reversal on this ground, defendant needed to "demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" meaning a "'probability sufficient to undermine confidence in the outcome.'" (*People v. Bolin, supra*, 18 Cal.4th at p. 333; *Strickland v. Washington, supra*, 466 U.S. at p. 694.)

12

Defendant claims his "testimony would deny the events as described. He would have identified himself in his booking photograph," which was "clearly distinguishable from the person identified as the shooter by all witnesses . . . ." But defendant's personal denial of any involvement in the shootings would have added nothing to the evidence already before to the jury. As discussed above, defendant's trial attorney emphasized the differences between the way defendant appeared in the video tape, recorded the same day as his arrest, and the eyewitnesses' descriptions of the gunman. Further, taking the witness stand would have opened defendant to cross-examination about his incriminating statements when placed in the same room with Sanchez. If, in fact, defendant was not the gunman, why would he be concerned about the discovery of a shotgun shell in the vehicle or state that without a gun, the police had no case. Under these circumstances, defendant cannot show a reasonable probability of a different result.

The trial court did not err in finding defendant failed to timely assert his right to testify.


*4. The Admission of Sanchez's Statement*

This case was initially assigned to the Honorable Cara D. Hutson for trial. At hearings in late 2009 and early 2010, Judge Hutson considered the admissibility of Sanchez's responses to Romero's queries when she visited him in jail. Judge Hutson ruled Sanchez's nodding his head yes to whether he was the driver and his written note that without a gun, the police did not have a case were admissible against Sanchez. However, she ruled Sanchez's nodding his head yes in response to Romero's question of whether defendant committed the shootings was inadmissible.

The case was subsequently reassigned to the Honorable Gerard S. Brown. At a pretrial hearing Judge Brown ruled Sanchez's nodding yes "in response to a question

13

from Romero that [defendant] was the shooter" was "inextricably intertwined with the first head nod and . . . somewhat with the note regarding no gun, no case" and thus also admissible as a declaration against penal interest.

On appeal, defendant does not challenge the merits of Judge Brown's ruling. But he contends Judge Brown "usurped [his] authority when [he] overruled" the prior ruling by Judge Hutson concerning the admissibility of Sanchez's affirmative head nod on whether defendant was the gunman.

No error occurred in Judge Brown's reconsideration of the admissibility of this evidence. Where a new trial is held "renewal and reconsideration of pretrial motions and objections to the admission of evidence" is permissible. (*People v. Mattson* (1990) 50 Cal.3d 826, 849; *People v. Beasley* (1967) 250 Cal.App.2d 71, 77 [pretrial ruling on a nonstatutory motion seeking to suppress evidence "is the equivalent of an order sustaining an objection to the same evidence, and is subject to the same procedural rules," and "[t]hese rules allow the trial court to reconsider, modify or set aside its order at any time prior to submission of the cause"].) And in *People v. Riva* (2003) 112 Cal.App.4th 981, the appellate court held that where the parties are afforded "notice and an opportunity to be heard, and" the ruling is not "arbitrary or made without reason," "pretrial rulings on the admissibility of evidence . . . should be reviewable by another judge following a mistrial because they are intermediate, interlocutory rulings subject to revision even after the commencement of trial." (*Id.* at p. 992, fn. omitted.)

The present case involves a similar situation. Judge Hutson's order was a pretrial ruling subject to change, not a final determination on the issue. The parties had notice that Judge Brown intended to reconsider the admissibility of Sanchez's response to the question of whether defendant was the gunman. He allowed the parties to argue the matter and then provided his reasons for ruling this evidence could be admitted at trial. Further, contrary to defendant's brief, his trial attorney did timely object to the admission of this evidence.

14

Thus, defendant's attack on the trial court's evidentiary ruling lacks merit.

DISPOSITION

The judgment is affirmed.


                                        RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.